## STATE of Tennessee

v.

## Robert T. DOWNEY.

Supreme Court of Tennessee,
at Nashville.

May 8, 2008 Session Heard at Jacksboro.[1]

Aug. 15, 2008.

1. Oral argument was heard in this case on May 8, 2008, in Jacksboro, Campbell County, Tennessee, as part of this Court's S.C.A.L.E.S.

(Supreme Court Advancing Legal Education for Students) project.

Robert T. Bateman, Clarksville, Tennessee, for the appellant, Robert T. Downey.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael E. Moore, Solicitor General; Brent C. Cherry, Assistant Attorney General (on appeal); John Wesley Carney, Jr., District Attorney General; Dan Brollier, Assistant District Attorney General (at trial); for the appellee, State of Tennessee.

## OPINION

WILLIAM M. BARKER, C.J., delivered the opinion of the court, in which JANICE M. HOLDER, CORNELIA A. CLARK, GARY R. WADE, and WILLIAM C. KOCH, JR., JJ., joined.

The defendant in this case was convicted of conspiracy to commit especially aggravated robbery, especially aggravated robbery, aggravated burglary, and reckless endangerment. The Court of Criminal Appeals affirmed his convictions but remanded for re-sentencing. We granted the defendant's application for permission to appeal to consider the following issues: 1) whether the trial court erred in denying defendant's motion to suppress his written statement; 2) whether the trial court erred by overruling defendant's motion to dismiss the indictment when the State violated rules of discovery; 3) whether the State failed to prove the use of a deadly weapon; 4) whether there was sufficient evidence of conspiracy to use a deadly weapon; and 5) whether the verdict was contrary to the weight of the evidence. Neither party appealed the Court of Criminal Appeals' decision to remand for re-sentencing. After considering these issues, we conclude that the trial court properly denied the defendant's motion to suppress and motion to dismiss. We also hold that there was sufficient evidence to support all of the convictions. We therefore affirm the defendant's convictions, while remanding to the trial court for re-sentencing under the Court of Criminal Appeals' order.

## Factual Background

In April 2001, Barbi Michelle Brown, a co-defendant and girlfriend of the defendant, Robert T. Downey, was living with her aunt, Patricia Rye, and the aunt's husband, James Neil Rye. While living with the Ryes, Ms. Brown met the victim, Charlie Rye, who was James Rye's father.

On the night of April 11, 2001, Ms. Brown approached the defendant about the possibility of robbing the victim. She knew the victim to be a "small, older man" who lived alone and typically carried a lot of cash with him. She described the victim's trailer and how it was laid out. The defendant agreed to participate in the robbery and asked co-defendant Marcus Green to participate as well. The three discussed what they would do if the victim were present or if he were asleep and woke up during the robbery. The defendant suggested that if this happened, they should "knock him out."

Later that night, Ms. Brown drove the defendant and Mr. Green to the victim's residence. Ms. Brown remained in the vehicle while the two men went into the home. The defendant was carrying a red metal flashlight with him. When the men entered the trailer, the victim woke up. The defendant struck him six or seven times in the head with the flashlight. The

men left with approximately $3,200 in cash from the victim's pants, the victim's television, and a large jar full of change. The three divided the cash, Mr. Green kept the jar of change, and the defendant kept the television, which he later sold.

The next morning, Mr. James Rye drove past the victim's home and noticed that the door was open and that the victim's truck was still there. Mr. Rye found this unusual because his father should have been at work. He entered the home and found the victim on his bed beaten, bleeding, and incoherent. The victim's pants and wallet were on the end of the bed. Mr. Rye noticed blood all over the victim and the wall. The victim's head had been severely beaten, his eyes were swollen shut, and there was blood in his mouth. As a result of his injuries, the victim was hospitalized for over a month. According to one of his attending physicians, his skull injuries were potentially life-threatening.

On May 5, 2001, the Montgomery County General Sessions Court issued an arrest warrant for the defendant, based on information the police obtained from "individuals, including a co-defendant." On May 8, 2001, the Clarksville Police Department received a tip as to the defendant's location. Officer Kelly Hewett called in the "TACT team" to make the arrest, after which time the defendant was placed in Officer Hewett's patrol car for transportation. Once in his custody, Officer Hewett asked the defendant if he needed any medical attention due to the fact that the TACT team had used some diversionary explosive devices, commonly known as "flash bangs,"[2] in making the arrest. The defendant stated that he did not and that he had planned to turn himself in the next day after he got an attorney. Officer Hewett drove the defendant to the Criminal Justice Complex (CJC).

Larry Hodge, a Criminal Investigator from the Montgomery County Sheriff's Department was on call and was asked to conduct an interview with the defendant when he was brought to the CJC. Sergeant Patrick Vaden was also present. Investigator Hodge advised the defendant of his *Miranda*[3] rights, and the defendant read and signed the admonition and waiver. Investigator Hodge told him that two other people had been apprehended and interviewed and that their statements had been videotaped. The defendant asked to see the tapes of the other two interviews. Investigator Hodge and Sergeant Vaden stepped out of the room to discuss the request, at which time Investigator Hodge realized that the videotape that was intended to record the defendant's interview had not been inserted and was not recording. He started the tape. Thus, when they re-entered the room, the remainder of the interview was recorded on videotape.

The defendant gave an oral confession, detailing the events of April 11, 2001. The investigators then asked the defendant to write out his statement. Investigator Hodge told the defendant that by cooperating with them by writing out a statement, he could not hurt himself, but might help. The defendant asked if he could make a phone call, and he was told that he could do that after he finished his statement. He then asked if he could give his written statement later and was told no. At that point, he sat down and wrote out his statement.

---

2. A "flash bang" device is also called a "concussion grenade." "A concussion grenade produces a brilliant flash and a loud noise designed to stun and disorient persons nearby, making resistance less likely." *United States v. Jones,* 214 F.3d 836, 837 (7th Cir. 2000).

3. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The defendant was indicted in June 2001 for conspiracy to commit especially aggravated robbery, especially aggravated robbery, aggravated burglary, theft, and attempted first degree murder. Prior to trial, the defendant filed a motion to suppress the videotaped and written confessions. An evidentiary hearing was held on June 8, 2004, after which the trial court denied the motion.

Following a jury trial held on September 27 and 28, 2004, the defendant was found guilty of conspiracy to commit especially aggravated robbery, especially aggravated robbery, aggravated burglary, and reckless endangerment. The trial court dismissed the charge of theft. The trial court sentenced the defendant as a Range I standard offender to eight years for the conspiracy, three years for aggravated burglary, one year for reckless endangerment, and twenty years for especially aggravated robbery. The court ordered the twenty-year sentence to run concurrently with the eight-year sentence. The court further ordered the one-year sentence to run consecutive to the three-year sentence, which in turn was to run consecutive to the twenty-year sentence, for a total effective sentence of twenty-four years.

The defendant appealed, challenging the trial court's denial of his motion to suppress his videotaped statement and written statement to police, the trial court's denial of his request to dismiss the indictments against him based upon the State's violation of a Rule 16 discovery request, the sufficiency of the evidence to support the convictions for especially aggravated robbery and conspiracy to commit especially aggravated robbery, and the imposition of consecutive sentencing. The Court of Criminal Appeals affirmed the conviction but remanded for a sentencing hearing so

the trial court could properly include the findings required for consecutive sentencing. The defendant filed a timely application for permission to appeal with this Court, which we granted.

### Analysis

#### I. Motion to Suppress

Prior to trial, the defendant filed a motion to suppress both his videotaped statement and his written statement. A hearing was held, at which time Investigator Hodge, Lieutenant Vaden, and Officer Hewett testified, and the videotaped and written statements were introduced into evidence. At the close of the hearing, the trial court denied the defendant's motion to suppress.[4]

When reviewing the correctness of a trial court's denial of a pretrial motion to suppress, the court on appeal must uphold the trial court's decision unless the evidence preponderates otherwise. *State v. Williams*, 185 S.W.3d 311, 314 (Tenn. 2006); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn.1996). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. We afford the prevailing party the " 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.' " *State v. Carter*, 16 S.W.3d 762, 765 (Tenn.2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn.1998)). Our review of a trial court's application of law to the facts, however, is conducted under a de novo standard of review. *Williams*, 185 S.W.3d at 315; *State v. Walton*, 41 S.W.3d 75, 81 (Tenn.2001).

---

**4.** The videotape was later suppressed at trial due to the State's violation of Tennessee Rule of Criminal Procedure 16.

*A. Was the defendant denied his constitutional right to counsel, thus requiring suppression of his written confession?*

According to Officer Hewett's written report following the defendant's arrest, while Officer Hewett was transporting the defendant to the CJC, the defendant told the Officer that he intended to turn himself in after he got an attorney. Once they arrived at the police station, the defendant was read his *Miranda* rights. The defendant verbally waived his rights and then signed an acknowledgment of that waiver. At some point after the waiver was signed, the video recorder was turned on.

The defendant argues that he made an unequivocal request for an attorney when he told Officer Hewett that he was planning on turning himself in after he got an attorney. Accordingly, it is his contention that any continued questioning by the police violated both his Fifth and Sixth Amendment rights to counsel.

*1. Fifth Amendment*

■ The Fifth Amendment, which is applicable to the states through the Fourteenth Amendment, *see Malloy v. Hogan,* 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), specifically provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The corresponding provision in the Tennessee Constitution provides "[t]hat in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Encompassed within these provisions is the right to counsel, which is applicable whenever a suspect requests that counsel be present during police-initiated custodial interrogation. *See State v. Saylor,* 117 S.W.3d 239, 244 (Tenn.2003). When a suspect invokes his right to counsel, police must cease all questioning until counsel is present. *See Miranda v. Arizona,* 384 U.S. 436, 444–45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *see*

*also Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Saylor,* 117 S.W.3d at 244.

■ In *Saylor,* we clarified what constituted a valid invocation of the constitutional right to counsel under the Fifth Amendment of the U.S. Constitution and article I, section 9 of the Tennessee Constitution. We began by reiterating that the standard for a valid invocation of the right to counsel is the same under both constitutions. *Saylor,* 117 S.W.3d at 246. We then held:

> The accused "must articulate his desire to have counsel present sufficiently clearly that a reasonable [police] officer ... would understand the statement to be a request for an attorney." *If the suspect fails to make such an unambiguous statement, police may continue to question him without clarifying any equivocal requests for counsel.*

*Id.* (citations omitted) (emphasis added); *see also Davis v. United States,* 512 U.S. 452, 461, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). In *Davis,* the United States Supreme Court specifically refused to adopt a rule that would require officers to ask questions to clarify an accused's statements. 512 U.S. at 461–62, 114 S.Ct. 2350.

■ In this case, the defendant told the transporting officer that he had planned to turn himself in after he got an attorney. The defendant merely mentioned a prior notion of obtaining counsel. He never requested an attorney following his arrest or suggested that he wished to speak with one in the future. The trial court found that this was not an unequivocal request for an attorney, and we agree.

*2. Sixth Amendment*

■ The right to counsel under the Sixth Amendment to the United States Constitution guarantees the accused the assistance of counsel after adversarial

criminal proceedings are initiated. The corresponding provision in the Tennessee Constitution is found in article 1, section 9, and provides that "the accused hath the right to be heard by himself and his counsel." Unlike the Fifth Amendment, under the Sixth Amendment, the accused need not make an unequivocal request for counsel to invoke the right. *See Michigan v. Jackson*, 475 U.S. 625, 633, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). A presumption exists that the accused requests the services of counsel at every *critical stage* of the prosecution. *Id.* "The purpose of the Sixth Amendment counsel guarantee—and hence the purpose of invoking it—is to 'protec[t] the unaided layman at critical confrontations' with his 'expert adversary,' the government, *after* 'the adverse position of government and defendant have solidified' with respect to a particular alleged crime." *McNeil v. Wisconsin*, 501 U.S. 171, 177–78, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (citations omitted) (alteration in original).

 After the initiation of formal charges against an accused, the Sixth Amendment right to counsel attaches, guaranteeing the accused the right to rely on counsel as a medium between himself and the State in any critical confrontation with state officials. *See Jackson*, 475 U.S. at 629, 106 S.Ct. 1404; *Huddleston*, 924 S.W.2d at 669. In Tennessee, the adversarial judicial process is initiated at the time of the filing of the formal charge, such as the indictment or arrest warrant. *Huddleston*, 924 S.W.2d at 669. Once formal criminal proceedings have begun, statements "deliberately elicited" from a defendant without an express waiver of the right to counsel are inadmissible in the prosecution's case-in-chief. The waiver of an accused's right to counsel after receiving *Miranda* warnings, or their equivalent, will generally suffice to establish a knowing and intelligent Sixth Amendment waiver of right to counsel, thus permitting the introduction of post-arrest statements. *Patterson v. Illinois*, 487 U.S. 285, 292–93, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988). However, once the accused has invoked his right to have counsel present during custodial interrogation, the accused may not be subjected to further interrogation by authorities until counsel has been made available. *Jackson*, 475 U.S. at 636, 106 S.Ct. 1404.

As stated previously, the defendant never requested assistance of counsel. The trial court found that the mention by the defendant to the arresting officer that he had intended to turn himself in after getting an attorney was not an invocation of his right, and we hold that the evidence does not preponderate against that conclusion. Additionally, the defendant waived any right that had attached by signing the waiver after receiving the *Miranda* warnings. *See Patterson*, 487 U.S. at 292–93, 108 S.Ct. 2389.

*B. Was the defendant's written statement rendered involuntary by actions of the investigating officers?*

The defendant argues that certain actions of the investigating officers were coercive and rendered his written statement involuntary, thus requiring suppression of that statement. Specifically, the defendant argues that the officers prevented him from making a phone call, required him to make his written statement when he wished to postpone it until later, and promised him that cooperating could not "hurt" him.

 The United States Supreme Court has held that in order for a confession to be involuntary, it must be the product of coercive state action. *See, e.g., Colorado v. Connelly*, 479 U.S. 157, 163–64, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). "The test of voluntariness for confessions under article I, § 9 of the Tennessee Constitution is broader and more protective of

individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn.1996) (citing *State v. Stephenson*, 878 S.W.2d 530, 544 (Tenn.1994)). In Tennessee, for a confession to be considered voluntary, it must not be the product of " 'any sort of threats or violence, ... any direct or implied promises, however slight, nor by the exertion of any improper influence.' " *State v. Smith*, 42 S.W.3d 101, 109 (Tenn. Crim.App.2000) (quoting *Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 42 L.Ed. 568 (1897)). The essential question therefore is "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined." *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn.1980) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961)).

A valid waiver of Miranda rights remains valid unless the circumstances change so seriously that the suspect's answers to interrogation are no longer voluntary or unless the suspect is no longer making a knowing and intelligent waiver of his rights. Courts must examine the totality of the circumstances to determine whether renewed warnings are required.

Factors to be considered when assessing the totality of the circumstances include: 1) the amount of time that has passed since the waiver; 2) any change in the identity of the interrogator, the location of the interview, or the subject matter of the questioning; 3) any official reminder of the prior advisement; 4) the suspect's sophistication or past experience with law enforcement; and 5) any indicia that the suspect subjectively understands and waives his rights. Because of the infinite variety of circumstances a case may present, the list of factors is by no means exhaustive. The weight to be accorded different factors will vary depending on the particular facts of the case.

*State v. Rogers*, 188 S.W.3d 593, 606 (Tenn. 2006) (citations omitted).

*1. Does the denial of the request to make a telephone call require suppression of the written statement?*

 The defendant argues that he was denied the opportunity to make a phone call prior to writing his statement, thus making his statement involuntary. The defendant asked the investigators: "Is there any way I'll be able to make a phone call tonight?" Investigator Hodge replied: "Yeah, soon as we get you downstairs we'll get you on the phone and try to post bond, okay?" The Court of Criminal Appeals concluded that this exchange "was in no way coercive."

Tennessee Code Annotated section 40–7–106(b) (2006) provides:

No person under arrest by any officer ... shall be named in any book, ledger or any other record until after the person has successfully completed a telephone call to an attorney, relative, minister or any other person that the person shall choose, without undue delay. One (1) hour shall constitute a reasonable time without undue delay. However, if the arrested person does not choose to make a telephone call, then the person shall be booked or docketed immediately.

With respect to this provision, we have held that

The failure to afford to a defendant the phone call required by this statute is but one factor to be considered in determining the voluntariness of the defendant's statement and whether the conduct of the officers has overcome the will of the accused. Automatic suppression of the statement is not called for.

*State v. Claybrook,* 736 S.W.2d 95, 103 (Tenn.1987).

While the investigating officers did not comply with the requirements of section 40–7–106(b), we are not persuaded that the statutory violation warrants suppression of the statement. The defendant's request to make a phone call came after he had already made his verbal confession to the investigating officers. Their denial of his request until after he provided a statement in writing, given the totality of the circumstances, did not render that written statement the product of police coercion. Because the evidence does not preponderate against the finding by the trial court that the written statement was voluntary, this issue is without merit.

2. *Does the officer's statement that the defendant's confession had to be written immediately make that statement involuntary?*

 The defendant argues that the written statement was involuntary because his request to write the statement at a later time "clearly shows that the defendant wished to remain silent at that point." The videotape of the police interview shows that after the defendant made his oral statement to the police, he was given a pen and paper to reduce his statement to writing. The police left the room. The tape shows the defendant sitting at the table with the paper, then knocking on the door to speak with an investigator. The defendant asked if he could write his statement later, and the investigator responded "No, we need to go ahead and get that done now." The defendant then took about twenty minutes to write out his statement.

 Once a person has been informed of his *Miranda* rights, "if the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda,* 384 U.S. 436, 473–74, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

To fully honor an accused's self-incrimination rights, the court stated that "[o]nce warnings have been given, ... [i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At that point, he has shown that he intends to exercise his Fifth Amendment privilege."

*State v. Crump,* 834 S.W.2d 265, 268–69 (Tenn.1992) (quoting *Miranda,* 384 U.S. at 473–74, 86 S.Ct. 1602). For example, in *State v. Cauthern,* after the defendant said that he was not guilty, the officer asked the defendant to tell them "just exactly what happened." 778 S.W.2d 39, 46 (Tenn. 1989). The defendant refused, and attempted to turn off the tape recorder. *Id.* The Court concluded that the officers should have concluded the interview at that time. *Id.*

Unlike the defendant in *Cauthern,* the defendant in this case never refused to give a statement. He had already given a verbal account of the events, which was videotaped. When asked to write out his statement, he simply asked if he could do that "later." He never told the officers that he no longer wished to cooperate or that he no longer wished to make a statement. The Court of Criminal Appeals concluded that the defendant's request to give his statement later was not a clear and unequivocal expression that he wished to remain silent. We agree that the officers' request was not coercive and did not render his statement involuntary.

3. *Did the officer's statement that the written confession could not "hurt" the defendant negate the Miranda warning or require suppression?*

 The defendant argues that his statement was not voluntary because it

was "induced by the improper statements of law enforcement"—the officer telling him the amount of prison time that he was facing, that his co-defendants were giving their side of the story, and assuring him that writing the statement could not "hurt" him.

Following the defendant's arrest, he orally waived his right to counsel, then signed a written waiver. The officers informed him that the two co-defendants had already made statements to the police, and they encouraged the defendant to tell his side of the story and to assist them in recovering the stolen television. After the defendant gave an oral statement to police, the investigators requested that he provide a written statement as well. The defendant asked, "How's this gonna help me?" The investigator responded, "Because you've been truthful, you've told your part, your involvement, you basically told it the way it happened and that way when the district attorney's office asks us, you know, 'Hey, was he cooperative?' we can say 'yeah.'" The officers continued to encourage the defendant by telling him that his statement "can't hurt you at all and certainly can help you."

In Tennessee, "[p]romises of leniency by state officers do not render subsequent confessions involuntary *per se:* 'The Fifth Amendment does not condemn all promise-induced admissions and confessions; it condemns only those which are *compelled* by promises of leniency.'" *State v. Smith,* 933 S.W.2d at 455 (quoting *Kelly,* 603 S.W.2d at 729). In determining whether or not a promise of leniency has "compelled" a statement, the court must examine "whether the behavior of the State's law enforcement officials was such as to overbear [the accused's] will to resist

and bring about confessions not freely self-determined." *Kelly,* 603 S.W.2d at 728 (quoting *Rogers,* 365 U.S. at 544, 81 S.Ct. 735). Additionally, "[a] defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense." *Smith,* 933 S.W.2d at 455 (quoting *State v. Brimmer,* 876 S.W.2d 75, 79 (Tenn.1994)). Rather, "coercive police activity is a necessary predicate to finding that a confession is not voluntary." *Id.*

In this case, the record fails to establish that the police exercised any compelling influence over the defendant or that his statements were induced by promises of leniency. The defendant had already confessed to the crimes, and it was only before the written statement that this discussion of cooperation and leniency took place.

## II. Failure to Disclose Entire Videotape

At trial, the State entered the written statement into evidence. The State then began to play the videotape of the defendant's statement, at which time the trial court stopped the tape because the tape showed investigators telling the defendant about the possible range of punishment for the crimes of which he was accused. At this time, defense counsel asked if this was the same videotape that had been furnished to the defendant and had been played at the suppression hearing. Outside the presence of the jury, the trial court and counsel for both parties determined that the first few minutes of the interview were not copied when a duplicate of the original was made for the State and the defense.[5]

---

**5.** According to the attorney for the State, law enforcement officials were responsible for making copies of the videotape for the State and for defense counsel. However, it was the State's responsibility to provide the defendant with accurate copies of evidence to be used against him.

■ The State's actions were in violation of Tennessee Rule of Criminal Procedure 16(a)(1)(B), which provides: "Upon a defendant's request, the state shall disclose to the defendant . . . (i) the defendant's relevant written or recorded statements, or copies thereof. . . ."[6] Additionally, the State's failure to disclose the entire videotape is a violation of due process. "The United States Supreme Court has held that 'suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution.'" *Sample v. State*, 82 S.W.3d 267, 270 (Tenn. 2002) (quoting *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)).

At issue is the appropriate penalty for failing to disclose the complete video. Tennessee Rule of Criminal Procedure 16(d)(2) provides:

If a party fails to comply with this rule, the court may:

(A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms or conditions;

(B) grant a continuance;

(C) prohibit the party from introducing the undisclosed evidence; or

(D) enter such other order as it deems just under the circumstances.

The defendant moved for the charges against him to be dismissed. However, instead of declaring a mistrial, the trial court sanctioned the State by excluding the use of the tape at trial.

■ Although Rule 16 does not explicitly provide as one of the sanctions the dismissal of the indictment after failure to comply with a discovery request or order, the rule does provide that the court may enter such sanction "as it deems just under the circumstances." Tenn. R.Crim. P. 16(d)(2)(D). This opened-ended language of the Rule authorizes the dismissal of an indictment in certain circumstances when a court would otherwise have "no effective sanction for failure to comply with its order." *State v. Collins*, 35 S.W.3d 582, 585 (Tenn.Crim.App.2000); *see also State v. Freseman*, 684 S.W.2d 106, 107 (Tenn. Crim.App.1984) (suggesting that if a trial court has the authority to dismiss a case as a sanction for failure to comply with discovery orders, it is implied authority pursuant to Tenn. R.Crim. P. 16(d)(2)). However, the Rule provides the court with many other methods for assuring compliance without resorting to such extreme measures. A trial court has wide discretion in fashioning a remedy for non-compliance with a discovery order, and the sanction should fit the circumstances of the case. *See Collins*, 35 S.W.3d at 585.

■ In this case, the trial court determined that the appropriate sanction was to prohibit the introduction of the videotape by the State. The court was able to give a curative instruction to the jury regarding the portion of the video that had been played, which contained the discussion of possible sentence ranges, thus negating any prejudice that may have occurred. Given the discretion afforded the trial court in fashioning the penalty, we conclude that the trial court's decision to suppress the videotape was sufficient penalty for the State's discovery violation.

---

**6.** Prior to trial, the defendant filed a general request for discovery pursuant to Tennessee Rule of Criminal Procedure 16(a)(1) and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that would have included the entire videotape of the recorded statement. The State complied by providing access to a "copy of the videotape." No order was required to be entered by the Court.

### III. Flashlight as a Deadly Weapon

■ The defendant was convicted of especially aggravated robbery and conspiracy to commit especially aggravated robbery, both of which require the use of a deadly weapon. The defendant asserts that the flashlight, which he used to beat the victim over the head, is not a deadly weapon.

■ Tennessee Code Annotated section 39–11–106(a)(5) (2003) defines "deadly weapon" as follows:

> "Deadly weapon" means:
> (A) A firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or
> (B) *Anything that in the manner of its use* or intended use *is capable of causing death or serious bodily injury* . . . .

(emphasis added). In *Morgan v. State,* we explained that " 'a dangerous or deadly weapon is any weapon or instrument which, from the manner in which it is used or attempted to be used, is likely to produce death or cause great bodily injury.' " 220 Tenn. 247, 415 S.W.2d 879, 882 (1967) (quoting 77 C.J.S. Robbery § 25).

In *Morgan,* we held that "a car tool, knife or other hard object wrapped in a sock and used as a bludgeon or club to assault a person" was a deadly weapon within the meaning of the robbery statute. 415 S.W.2d at 882. Since then, many common items have been held to qualify as deadly weapons when the defendant in the particular case used or intended to use the item in such a manner as to be capable of causing death or serious bodily injury. *See, e.g., State v. Madden,* 99 S.W.3d 127, 137 (Tenn.Crim.App.2002) (pointed-toe cowboy boots used to kick person lying on ground were deadly weapons); *State v. Eaves,* 959 S.W.2d 601, 604 (Tenn.Crim. App.1997) (hard plastic pen used to stab a person was a deadly weapon); *State v. Tate,* 912 S.W.2d 785, 787–88 (Tenn.Crim.

App.1995) (automobile used to run into person was a deadly weapon).

A flashlight, as used by the defendant in this case, is capable of causing serious bodily injury. The defendant hit the victim over the head with the flashlight multiple times, causing potentially life-threatening head injuries which left the victim in the hospital for over a month. This issue is without merit.

### IV. Sufficiency of Evidence

■ The standard for appellate review when a criminal defendant challenges the sufficiency of the evidence is "whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Reid,* 91 S.W.3d 247, 276 (Tenn.2002); *see also* Tenn. R.App. P. 13(e) ("Findings of guilt in criminal actions . . . shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). When reviewing the evidence, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Smith,* 24 S.W.3d 274, 279 (Tenn.2000). Furthermore, "this Court does not re-weigh or re-evaluate the evidence. Nor may this Court substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact." *Reid,* 91 S.W.3d at 277 (citation omitted).

#### A. Conspiracy Conviction

■ The defendant argues that there was insufficient evidence presented at trial to support his conviction for conspiracy to commit especially aggravated robbery. Specifically, he contends that there is no evidence of an agreement between the co-defendants to use a deadly weapon or that serious bodily injury would be inflicted

upon the victim. However, the testifying co-defendant, Ms. Brown, admitted that they discussed what to do if the victim awoke. She said that "there was a discussion, what was brought up was [the defendant] would knock [the victim] out."

▇▇ For a charge of conspiracy, the State must prove the following:

> two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense.

Tenn.Code Ann. § 39–12–103 (2006). In determining whether there was an agreement between the parties, we have long held:

> To prove a conspiracy, it is not necessary that the State show a formal agreement between the parties to do the unlawful act, but a mutual implied understanding is sufficient, although not manifested by any formal words, or by a written agreement. The unlawful confederation may be established by circumstantial evidence and the conduct of the parties in the execution of the criminal enterprise.

*State v. Carter,* 121 S.W.3d 579, 589–590 (Tenn.2003) (quoting *Randolph v. State,* 570 S.W.2d 869, 871 (Tenn.Crim.App. 1978)).

When viewing the evidence in the light most favorable to the State, *see Smith,* 24 S.W.3d at 279, we conclude that the evidence was clearly sufficient to support an agreement between the defendants to "knock" the victim out if necessary to complete the robbery. The evidence is also sufficient to support an agreement that this would require the use of some type of weapon or object with which to hit the victim in order to knock him unconscious.

*B. Remaining Convictions*

Lastly, the defendant asserts that if his written statement is suppressed, there is no evidence to corroborate the co-defendant's testimony, and a conviction may not be based solely on the uncorroborated testimony of an accomplice. *See State v. Stout,* 46 S.W.3d 689, 696–97 (Tenn.2001); *State v. Bigbee,* 885 S.W.2d 797, 803 (Tenn. 1994). The only evidence produced at trial corroborating the co-defendant's testimony as to the identity of the defendant was the defendant's own written statement. The defendant argues that if we suppress the written statement as he thinks we should, then there would be insufficient evidence to support the conviction and the charges should be dropped. This issue is moot, however, because as we discussed above, we hold that the written statement should not have been suppressed.

## Conclusion

In sum, we hold that the trial court did not err in denying the defendant's motion to suppress his written statement. The defendant was not denied his right to counsel, nor was the written statement a product of coercive police action. The trial court also did not err in denying the defendant's motion to dismiss. The court's decision to suppress the videotape as a sanction for violation of the rules of discovery was appropriate under the circumstances. The evidence was sufficient to support a conviction for aggravated robbery because the metal flashlight as used was properly classified as a deadly weapon. There was sufficient evidence to support the conspiracy conviction given the testimony of the co-defendant. As such, we affirm all the defendant's convictions. The Court of Criminals Appeals held that the case should be remanded for re-sentencing, specifically regarding the propriety of consecutive sentencing, and neither party

challenged that portion of the decision. Therefore, the case is remanded for re-sentencing pursuant to the judgment of the Court of Criminal Appeals.

It appearing that the defendant is indigent, costs of this appeal are taxed to the State of Tennessee.