# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### September 16, 2014 Session

## STATE OF TENNESSEE v. DAVID ANDREW OLIVER

**Direct Appeal from the Criminal Court for Knox County**
**No. 99742      Steven Sword, Judge**

─────────────────────

**No. E2013-02426-CCA-R3-CD - Filed November 20, 2014**

─────────────────────

A Knox County Criminal Court Jury convicted the appellant, David Andrew Oliver, of rape of a child, a Class A felony, and the trial court sentenced him to twenty-five years to be served at 100%. On appeal, the appellant contends that the trial court erred by denying his motion to suppress his confession to police and by limiting his cross-examination of the victim about her prior inconsistent statements. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which ROGER A. PAGE, and ROBERT H. MONTGOMERY, JR., JJ., joined.

Robert C. Edwards, Knoxville, Tennessee, for the appellant, David Andrew Oliver.

Robert E. Cooper, Jr., Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; Randall Eugene Nichols, District Attorney General; and Kyle Hixson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

In June 2012, the Knox County Grand Jury indicted the appellant for one count of rape of a child. The appellant proceeded to trial in June 2013.

The appellant does not contest the sufficiency of the evidence. Taken in the light most favorable to the State, the evidence shows that in October 2011, the victim's aunt and a female cousin were living in a small house on Boone Street in Knoxville. One night near

Halloween, the then twelve-year-old victim spent the night there. The appellant, who was dating the victim's cousin, also spent the night. The victim slept on the living room couch but woke to discover the appellant staring at her. The appellant forced himself on the victim, penetrated her vagina with his penis, and ejaculated. About one year later, the victim revealed the incident to a counselor and was interviewed at Childhelp. As a result of the Childhelp interview, officers with the Knoxville Police Department (KPD) began investigating the victim's allegations and interviewed the appellant. During the appellant's interview, he admitted knowing the victim and spending the night at the home on Boone Street while the victim was there. The officers suggested to the appellant that the victim became pregnant and had a baby, which was not true. The appellant told the officers that he forced the victim to have sex with him, that she tried to fight him off, and that he ejaculated. After the interview, the appellant wrote a letter to the victim in which he apologized for hurting her. He also wrote that, if she had a baby, he wanted a DNA test to determine if he was the father and wanted to see the baby.

The jury convicted the appellant as charged of rape of a child, a Class A felony. After a sentencing hearing, the trial court sentenced him to twenty-five years in confinement to be served at 100%.

## II. Analysis

### A. Motion to Suppress

The appellant contends that the trial court erred by denying his motion to suppress his confession to police because he invoked his right to counsel prior to his interview. The State argues that the trial court properly denied the motion. We agree with the State.

Before trial, defense counsel filed a motion to suppress the appellant's statement to the Knoxville police officers on the basis that the appellant requested an attorney prior to his interview. At a hearing on the motion, Investigator Jeff Damewood of the KPD testified for the State that he began investigating the victim's allegations and learned the appellant's name. One morning during Memorial Day weekend of 2012, Investigator Damewood went to the appellant's parents' home and talked with the appellant at the front door. He told the appellant that the appellant's "name had come up in an investigation" and said that he "needed to speak with" the appellant. He requested that the appellant come to the police department for an interview, and the appellant agreed, stating that his stepfather would drive him.

Investigator Damewood testified that he returned to the police department. When the appellant and his stepfather arrived, they waited for Investigator Damewood in the lobby

downstairs. Investigator Damewood went down to the lobby, and he and the appellant rode the elevator upstairs. They went into an interview room, and Investigator Damewood read a waiver of rights form to the appellant. The appellant initialed each right and signed the form twice. Investigator Damewood said the appellant never asked for an attorney.

On cross-examination, Investigator Damewood testified that when he went to the appellant's parents' home that morning, the appellant's parents may have stood at the door with the appellant. He said he told all of them, "'When you come down and talk to me, you're going to walk right out the same door you came in. You're coming back home.'" He acknowledged knowing at the time of the appellant's interview that the appellant was a registered sex offender. He said that the appellant did not mention the name "Steve Shope" and that he did not know Shope was a lawyer. When Investigator Damewood went down to the lobby to get the appellant, the appellant's stepfather was with him. Investigator Damewood did not remember if the appellant's mother was present. The appellant's stepfather asked to go upstairs with them, but Investigator Damewood told him, "[N]o . . . he's an adult." Investigator Damewood acknowledged that his goal that day was to obtain a confession from the appellant and said that he never told the appellant that the appellant did not need an attorney. Prior to the appellant's interview, a female officer spoke with the appellant about the appellant's participation in the sex offender registry. Investigator Damewood then read <u>Miranda</u> warnings to the appellant and interviewed him about the victim's allegations. After the interview, Investigator Damewood allowed the appellant to leave the police department. He later arrested the appellant at the appellant's parents' home.[1]

Donna Dubray, the appellant's mother, testified that when Investigator Damewood arrived at her home that morning to speak with the appellant, the appellant answered the door. Mrs. Dubray also went to the door and asked the officer what was going on. Investigator Damewood told her, "'Well, David's name came up on a case two and half years ago.'" Mrs. Dubray asked if the officer had a warrant. The officer said no but that "'[a]ll we need is for David to come down and give us a statement.'" She said that the officer did not say anything specific about his investigation and that "[h]e was just more concerned with getting David down there at 9:30." After the officer left, Mrs. Dubray tried calling Steven Shope, who had been the appellant's attorney "for a long, long time." She also told the appellant to ask for a lawyer when he got to the police department. The appellant told her that "he had intentions to." The appellant's stepfather drove him to the police department, but Mrs. Dubray did not go with them.

Frank Dubray, the appellant's stepfather, testified that before he and the appellant left

---

[1] The record reflects that Investigator Damewood interviewed the appellant on May 28 and arrested him on June 7, 2012.

for the police department, the appellant's mother said she was going to try to contact attorney Steven Shope and have Shope meet the appellant there. During the drive to the police department, Mr. Dubray told the appellant "to answer whatever the gentleman had . . . honestly." He said he also told the appellant that "no matter what, make sure you ask for your lawyer." The appellant answered, "'Yes, Dad, I'm going to.'" When they arrived at the police department, Mr. Dubray and the appellant sat on a bench by the elevator. Investigator Damewood came down to get the appellant, and the appellant, Investigator Damewood, and two other officers got into the elevator. Mr. Dubray stepped toward the elevator, but Investigator Damewood said Mr. Dubray could not go with them. Mr. Dubray said that after the appellant and the officers got into the elevator, he heard the appellant ask Investigator Damewood, "'Do you think I need my lawyer?'" Investigator Damewood answered, "'That's up to you.'" As the elevator doors were closing, Mr. Dubray heard the appellant say, "'Yes. I would like my lawyer.'"

On cross-examination, Mr. Dubray testified that as he motioned toward the elevator to go upstairs with the appellant, Investigator Damewood "made a move" toward his gun, so Mr. Dubray "just backed off, sat down." He said that after the interview, the appellant told him that when the appellant and the officers got off the elevator upstairs, the appellant told them again that he wanted his lawyer.

The appellant testified that prior to going to the police department, he tried to contact attorney Steven Shope but that Shope was in a conference. The appellant said he went to the police department anyway because "the guy gave me 25 minutes to come down" and because "I felt like it was a threat, or like I was going to go to jail or something like that." When he and his stepfather arrived at the police department, they sat in the lobby. Investigator Damewood came down in the elevator. The appellant asked if he needed his lawyer present, and Investigator Damewood replied, "'It's up to you.'" The appellant said, "'Well, then I need my lawyer present.'" The appellant stated that Investigator Damewood told him to get into the elevator and that the officer "had his hand on his side near his pistol," causing the appellant to feel scared and afraid. The appellant got into the elevator with Investigator Damewood, a female "sex offender detective," and "the female for DHS." As all of them were getting out of the elevator upstairs, the appellant again stated that he needed his lawyer present. Everyone went into an interview room, and the sex offender detective began "drilling" him about his sex offender registration. Just before she stopped questioning him, the appellant asked for his lawyer a third time. Investigator Damewood had the appellant sign a waiver of rights form and began interviewing him.

On cross-examination, the appellant testified that he first asked for his attorney while he was downstairs in front of the elevator. Investigator Damewood told him, "We're going upstairs to talk." Although the officer told the appellant that he could leave, the appellant

still felt threatened. He said that Investigator Damewood did not start recording his interview until after the sex offender registration officer had stopped questioning him and he had told her that he wanted his attorney. When confronted with the possibility that his conversation with the sex offender registration officer also was recorded, the appellant stated that he could have been "mixed up" about his asking for an attorney. He said, though, that "I know I asked for an attorney plenty of times that day" and that "I know I asked for an attorney downstairs."

The trial court found Investigator Damewood "credible on what he could remember" and that "when he says the defendant never asked for an attorney, I do find that credible." The court stated that it found the appellant's parents credible "for the most part" but that it "did have some question" about Mr. Dubray's hearing the appellant say in the elevator that he wanted his lawyer. Regarding the appellant's credibility, the trial court noted that the appellant "backpeddle[d]" when the State confronted him about his conversation with the sex offender officer being recorded. The trial court stated that it had "some real concerns" about the appellant's credibility but that even if the appellant made a request for his attorney, the request was equivocal. The trial court ruled that the appellant failed to show he requested an attorney "at any point" and denied his motion to suppress.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001).

Initially, we note that the appellant acknowledged at the suppression hearing and acknowledges on appeal that his Fifth Amendment right to counsel is not at issue here because he was not under custodial interrogation. See State v. Saylor, 117 S.W.3d 239, 244 (Tenn. 2003) (stating that "[e]ncompassed within these constitutional provisions [of the Fifth Amendment to the United States Constitution and article 1, section 9 of the Tennessee Constitution] is the right to counsel, which is applicable whenever a suspect requests that counsel be present during police-initiated custodial interrogation"). Instead, he argued at the hearing and argues on appeal that the police violated his Sixth Amendment right to counsel. The trial court agreed with the appellant, stating in its ruling, "This is a Six Amendment issue." However, "[t]he right to counsel under the Sixth Amendment to the United States Constitution guarantees the accused the assistance of counsel after adversarial criminal proceedings are initiated." State v. Downey, 259 S.W.3d 723, 732-33 (Tenn. 2008). Formal charges had not been initiated against the appellant at the time of his interview. Therefore, his Sixth Amendment right to counsel also is not at issue. See id. at 733. In any event, even

if the appellant's interview could be considered a custodial interrogation, the trial court discredited testimony by the appellant and his stepfather that he unequivocally asked for counsel and accredited Investigator Damewood's testimony that he did not. Nothing preponderates against the findings of the trial court, and the appellant is not entitled to relief.

## B. Cross-examination of Victim

The appellant contends that the trial court erred by limiting his ability to impeach the victim, especially with inconsistent statements she made at Childhelp, and by refusing to allow him to play the victim's entire Childhelp interview for the jury. The State argues that the trial court properly limited the cross-examination and correctly ruled that the appellant could not play the entire interview. We agree with the State.

The record reflects that about one year after the incident with the appellant, the victim spoke with a female employee at Childhelp and that her interview was recorded and transcribed. Before trial, the defense filed a motion pursuant to Rule 412, Tennessee Rules of Evidence, requesting that it be allowed to question the victim at trial about two incidents she had revealed to the Childhelp employee: that she had been raped by a Hispanic man when she was eleven years old and that she had had consensual sex with her boyfriend sometime prior to the appellant's raping her. The victim's Childhelp interview was introduced into evidence as a sealed exhibit during the hearing. After a hearing on the motion, the trial court ruled that the appellant could question the victim about both events to show how a child her age would have known about sexual matters. However, the court stated that it was going to "put some strict limitations" on the questioning and that the defense could only ask the victim certain questions about the events.

On direct examination at trial, the victim described the appellant's raping her. She also testified that the first person she told about the rape was her therapist. On cross-examination, the victim testified that when she was thirteen years old, she went to live with her father's ex-girlfriend, Courtney. Defense counsel asked the victim if she talked with Courtney about being raped by the appellant. At first, the victim said no. However, she then said, "Actually, yeah, I did. Sorry." Nevertheless, she maintained that her therapist was the first person to whom she revealed the rape. Defense counsel also questioned the victim extensively about the details of rape, and she frequently responded that she could not remember. In fact, the victim answered that she could not remember at least fifteen times. In a bench conference, defense counsel requested that he be allowed to impeach the victim with her Childhelp interview. The trial court stated, "As long as it's about this incident, that's fine."

After the victim's testimony, the State called Investigator Damewood to the stand.

At the conclusion of his direct and cross-examination testimony, the jury retired for the day. In a jury-out hearing, defense counsel requested that he be allowed to play the victim's recorded Childhelp interview for the jury, stating,

> I think there's actually kind of a handful of inconsistencies between what [the victim] testified to in court and what she related to Child Help . . . . I am understanding the Court to be saying is that I can play [the victim's] statement to Child Help, but only as . . . it pertains to the details of her allegation against Mr. Oliver.

The trial court advised defense counsel that he could play the portions of the interview "that you asked her about and she testified inconsistently to." Defense counsel and the trial court discussed which portions of her testimony had been inconsistent with her Childhelp interview, and the trial court offered to "give [defense counsel] the night" to find the inconsistencies.

The next morning, defense counsel requested that he be allowed to play for the jury the portion of the victim's interview in which she said that the first person she told about the rape was Courtney. The trial court ruled that defense counsel could play that portion of the interview. Defense counsel also requested to play the victim's entire interview because "the testimony has shown on direct and cross-examination [that the victim] has problems with recalling the specifics. At many junctures she used the phrase, 'I do not remember.'" The trial court refused, stating,

> I think that her statements about 'I don't recall' or 'I don't remember' were reasonable to me. I didn't feel she was being evasive to try to evade your questions or answering those questions, and so I don't think there's any reason to introduce any more of her statement than what I'm going to allow you to, that limited bit on the prior inconsistency.

"[I]t is well-established that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of discretion." State v. Stinnett, 958 S.W.2d 329, 331 (Tenn. 1997). Tennessee Rule of Evidence 613(b) provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." The Rule allows the use of prior inconsistent statements to impeach a witness. If a party presents a prior inconsistent

statement to the witness, the witness "has several possible responses: the witness can admit, deny, or not remember making all or part of the statement." Neil P. Cohen et al., Tennessee Law of Evidence § 6.13[5][a] (6th ed. 2011). If the witness admits making the prior inconsistent statement, extrinsic proof of the statement would be cumulative and, therefore, inadmissible. Id. If the witnesses denies or does not remember making the inconsistent statement, extrinsic proof of the statement is admissible.

Turning to the instant case, the appellant contends that the trial court erred by limiting his cross-examination of the victim, particularly his impeachment of her with her prior inconsistent statements at Childhelp, and by refusing to allow him to play her entire Childhelp interview for the jury. We disagree. Defense counsel was allowed to cross-examine the victim about problems she had with her family, problems she had at school, and the two prior sexual encounters. Toward the conclusion of her testimony, the defense requested to impeach her with her prior inconsistent statements at Childhelp, and the trial court stated, "As long as its about this incident, that's fine." The trial court advised counsel, "You need to ask her first about did she make a prior statement and give her a chance to explain before . . . you play it to impeach her."

When cross-examination resumed, defense counsel asked the victim if she remembered speaking with a woman at Childhelp, and the victim answered, "Yeah, kind of." However, instead of questioning the victim about any specific inconsistent statements she made at Childhelp, defense counsel continued to ask her general questions about her being raped by the appellant. For example, defense counsel asked her what she said to the appellant before the rape, if she tried to hit him during the rape, and if she tried to wake her aunt after the rape. Each time, the victim answered, "I don't remember." Eventually, defense counsel asked her if she remembered telling the Childhelp interviewer that the appellant stopped raping her because he got scared when her aunt "sort of woke up." Counsel did not confront the victim further with her interview. In sum, despite being given the opportunity to impeach the victim with at least portions of her interview, defense counsel did not first afford her an opportunity to admit, deny, or explain her prior inconsistent statements. As a result, he could not play her statements for the jury.

In any event, even if the victim's Childhelp statements had been admissible as extrinsic evidence, the appellant could not have played the entire interview. The title of Tennessee Rule of Evidence 613(b) plainly states that it applies to prior inconsistent statements. Our review of the victim's Childhelp interview reveals that portions of it were inconsistent with her trial testimony. Thus, only those portions would have been admissible.

To the extent the appellant is arguing that the trial court erred by limiting his cross-examination of the victim about her prior sexual encounters with the Hispanic man and her

boyfriend, the trial court properly held a hearing pursuant to Tennessee Rule of Evidence 412, which acknowledges that under certain circumstances, the exclusion of evidence about a victim's sexual behavior may violate a defendant's right of confrontation, his right to present a defense, and, more broadly, his right to a fair trial. See Tenn. R. Evid. 412. The court ruled that the appellant could question the victim about both encounters, albeit with limitations, to explain her knowledge about sexual matters. See Tenn. R. Evid. 412(c)(4)(ii). On cross-examination, defense counsel questioned the victim briefly about both events. On appeal, the appellant acknowledges that the trial court "ruled admissible both the consensual sex and the rape by the Hispanic male" and does not explain on appeal how the trial court erred pursuant to Tennessee Rule of Evidence 412. Therefore, he is not entitled to relief. See Tenn. R. App. P. 36(a).

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE