# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs February 14, 2012

## STATE OF TENNESSEE v. JAMAAL EDDIE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 0906905      Chris B. Craft, Judge**

---

**No. W2011-00966-CCA-R3-CD - Filed June 18, 2012**

---

After a jury trial, the defendant, Jamaal Eddie, was convicted of aggravated child abuse and of first degree murder committed in the perpetration of aggravated child abuse. He is serving an effective life sentence. The defendant appeals, contending that the evidence was insufficient to support the verdict of first degree felony murder, that photographs of the victim were admitted into evidence in error, and that the defendant's confession was admitted in error because it was not given voluntarily. We conclude that the evidence is sufficient to uphold the verdict and that there was no error in the admission of the photographs or the defendant's statement. Accordingly, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and CAMILLE R. MCMULLEN, J., joined.

Stephen C. Bush, District Public Defender; and Harry E. Sayle, III; Tim Albers; and Mark Alston, Assistant Public Defenders, for the appellant, Jamaal Eddie.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Amy P. Weirich, District Attorney General; and Dean Decandia and Jennifer Nichols, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

This case arises from the death of an eleven-month-old child. The victim, referred to as Z, was admitted to LeBonheur Hospital in Memphis suffering from severe brain injury and bruises to the buttocks after having spent the bulk of the day in the care of the defendant,

who was dating the victim's mother. Following the victim's death, the defendant signed a statement admitting that he had caused the injuries which ultimately killed the victim. The defendant was indicted for first degree murder committed in the perpetration of aggravated child abuse; aggravated child abuse; and aggravated child neglect or endangerment.

Prior to the jury trial, the defendant filed a series of motions, including a motion to suppress a statement he gave to the police and a motion to suppress certain photographs which the State intended to introduce into evidence. The trial court held a hearing on the motion to suppress the defendant's statement on September 24, 2010. Joe Stark, a sergeant with the homicide bureau of the Memphis Police Department, testified regarding the circumstances around the defendant's statement. Sergeant Stark testified that the defendant became a suspect based on information Sergeant Stark received from the medical examiner, from the child's aunt, and from an officer who had been assigned to the case prior to the victim's death. The defendant was arrested on March 3, 2009 between 7:00 and 9:00 p.m.

Sergeant Stark and another officer, Sergeant Lundy, interviewed the defendant in a large room. The defendant did not appear intoxicated to Sergeant Stark, and Sergeant Stark did not smell alcohol or marijuana on the defendant. Although Sergeant Stark testified that he would normally ask if the suspect was under the influence, he did not recall asking the defendant if he was intoxicated. The defendant, on the other hand, testified that he had been drinking beer and smoking marijuana since around noon that day. He testified that he had consumed twenty-four beers and smoked between twenty and forty fairly thick marijuana cigarettes in that time. He testified that he was intoxicated but that the police officers never asked him if he was intoxicated and that he did not volunteer the information. The defendant was given a form advising him of his rights, including his right to remain silent. Sergeant Stark testified the defendant was asked to read the first line aloud and had no problem; the defendant then read the rest to himself. At the hearing, the defendant testified that he was intoxicated but nevertheless affirmed that at the time of the interview, he understood his rights, he had no problem understanding his rights, and he wished to give a statement.

The defendant initially stated that the victim fell from the bassinet and he shook him to try to wake him. According to Sergeant Stark, he only told this story one time; according to the defendant, he told it four to five times. Sergeant Stark testified that he told the defendant that the injuries were not consistent with the defendant's version of events. Although Sergeant Stark testified that he made no promises or threats, he also recalled telling the defendant, "I said if he cooperates, if he tells us what really happened[,] things could change. I mean, as far as the matter of charge could change." The defendant, on the other hand, testified that after Sergeant Lundy found out, through the defendant's tattoo, that the defendant had a daughter, he said, "[Y]ou might not ever get to see her again if I give you this 51 years. Help me to help you. If you tell us what we want to know, then I will help you

-2-

get the less time. You will get maybe three to six years rather than 51 years." The defendant testified that he didn't understand "the whole court system" and believed the police could give him fifty-one years.

Sergeant Stark testified that the defendant admitted that the victim had been crying, that he "spanked" the eleven-month-old victim, and that he put the victim on the floor and hit him in the head numerous times. The victim then became unresponsive, and the defendant called the victim's mother, who was almost home. Sergeant Stark testified it was one of the quickest interviews he had ever done. The officers then took a formal statement from the defendant; the statement began with informing the defendant of his rights and the defendant initialed next to the waiver of his rights, initialed each page, and signed the back page. Sergeant Stark testified that the defendant read the statement and never invoked his right to remain silent or asked for an attorney. The defendant, on the other hand, testified that the police officers told him what the medical evidence was and that his story would have to match it; specifically, he testified the officers told him he would have had to hit the victim numerous times to be consistent with the injuries. He further testified that, while a third officer who was typing his statement was engaged in looking at the computer screen, Sergeant Lundy and Sergeant Stark would indicate the answers he should give to questions by nodding or shaking their heads. On cross-examination, the defendant testified that although the police prompted him to say he hit the victim in the head, he was not prompted to say he spanked the victim and that he had in fact spanked the victim: "No, I spanked him. That I did do." Sergeant Stark also testified that there were two errors in the date: that the year should have been 2009 and that, because it was midnight when the statement was signed, it should have been dated March 4.

At the conclusion of the hearing, the trial court found that it was "fairly obvious . . . that Mr. Eddie is not being truthful" based on his demeanor and because, given the alcohol and marijuana consumption to which the defendant testified, "it's just ridiculous that he would be able to walk to this interview if that were true." The court found Sergeant Stark to be a credible witness. The trial court denied the motion to suppress.

The defendant's jury trial began on February 14, 2011. At trial, the State's first witness was the victim's father, Brennan Rayford, with whom the victim had spent most of the previous two weeks. Mr. Rayford testified that he and the victim's mother, Tyra Hampton, broke up one to two months after the victim's birth. Mr. Rayford had nevertheless been involved in his son's life and had kept him overnight and for extended visits prior to February of 2009. Mr. Rayford testified that the victim had a cold when he arrived for the visit and that he consulted the victim's mother and treated the victim's cold with over-the-counter medication. He testified that the victim recovered after about three or four days and behaved normally for the rest of the visit; on cross-examination, Mr. Rayford acknowledged

-3-

that the victim had vomited. During the visit in February 2009, Mr. Rayford lived in Mississippi with his girlfriend and her four children, who were between nine and twelve years old. Mr. Rayford testified that on occasion during the visit, including Thursday, February 26, 2009, his girlfriend cared for the victim while he worked; this was not the first time his girlfriend or her children had been around the victim. On the evening of February 26, 2009, Mr. Rayford got off work and gave the victim a bath; the victim was behaving normally. Mr. Rayford then left the victim off at the victim's mother's house between 11 p.m. and 12 a.m., while the victim was sleeping. The next evening, Mr. Rayford's father alerted him that the victim was in the hospital. Mr. Rayford went to the hospital and remained there during the victim's stay; he spoke to the police while there. He did not see the defendant come to the hospital.

The State's next witness, Yashika Douglas, was Tyra Hampton's neighbor at the time of the victim's injury and drove Ms. Hampton and the victim to the hospital. Ms. Douglas testified that she had lived next to Ms. Hampton since approximately July of 2008. During the day on Friday, February 27, 2009, she was home with her sick son. Ms. Douglas heard a loud thump coming from Ms. Hampton's apartment (as if an appliance had fallen over) in the middle of the day; she did not hear crying or voices. Around the time it was getting dark, Ms. Hampton knocked on Ms. Douglas's door to ask for a ride to the hospital. Ms. Hampton was "upset" but not hysterical. Because Ms. Douglas and her child were not dressed or ready to leave immediately, Ms. Douglas asked Ms. Hampton if she would like to call an ambulance, and Ms. Hampton refused "because she said they usually get in your business, all in your business." Ms. Douglas testified Ms. Hampton was "kind of beating on my door the whole time" she was preparing to go. Ms. Douglas met the defendant, Ms. Hampton, and the victim on the balcony. The defendant was stuffing clothes into a backpack, which was "over full" with clothing, and he did not accompany them to the hospital. Observing the victim's condition, Ms. Douglas asked if he was that way when his father dropped him off, and Ms. Hampton said he was not. Ms. Douglas testified that she had never seen Ms. Hampton treat the victim in a way that would concern her.

Tyra Hampton, the victim's mother, testified that because she had obtained her apartment through a housing program, she was not permitted to have overnight guests or guests in her apartment if she was not present. Ms. Hampton testified that she was employed at the time of the victim's death. Most days, a bus from a daycare would come pick up her baby and then Ms. Hampton would ride the 8:00 or 8:30 a.m. city bus to work; her commute lasted about an hour. After she got home, the daycare bus would drop her baby off. The daycare bus required twenty-four hours notice to come pick up a child. If Ms. Hampton was working during the weekend or when the daycare was closed, her mother, her sister, the victim's father, or the defendant, as "the last resort" would take care of the victim. The defendant was unemployed, and Ms. Hampton testified he had taken care of the victim

during the day approximately three times prior to February 27, 2009. Ms. Hampton testified that on the three prior occasions that the defendant had cared for her son there had been no signs of injury or any other problems.

On February 26, 2009, Mr. Rayford brought the victim home. The defendant was in Ms. Hampton's apartment at the time. Ms. Hampton woke the victim up because she had missed him. Ms. Hampton testified the victim had never had bruises after spending time with his father. She also testified that when she woke the victim the night that Mr. Rayford dropped him off, he "act[ed] like he didn't know me," and he "wasn't responding to my happiness." Ms. Hampton testified that the victim looked at her and was breathing normally. The next morning, Ms. Hampton changed the victim's diaper and fed the victim a bottle, which he held in a "lazy" manner because he was lying down. The victim was acting normal and went back to sleep. Because she had not expected Mr. Rayford to bring the victim back that day, she had not given the daycare the required notice to come pick him up, so she let the defendant keep him for the day. Ms. Hampton testified that the defendant called her as soon as she got to work to report the victim wouldn't hold his bottle. He next called about an hour or an hour and a half later to tell her that he was giving the victim a bath. The defendant called again before her shift was scheduled to end at 3 p.m. to tell her that the victim wouldn't stand up on his musical table, his favorite toy, or play with it. Ms. Hampton told the defendant to lay him down and said she would be home soon. However, Ms. Hampton had to stay late because the next cashier did not arrive on time. The defendant called again to state that the victim would not stop crying. Ms. Hampton could hear the victim crying in the background. Ms. Hampton arrived at the apartment complex at around 5:30 p.m., and the defendant called her as she stopped to check the mail; he told her to hurry up and get to the house. In the house, the defendant told her that the victim had fallen out of bed and would not wake up. The victim was limp.

Ms. Hampton called her sister, Terrika Hampton, to take her to the hospital. She called Terrika Hampton because she thought she could get to the hospital, which was three to five minutes away, more quickly through her own means than by ambulance. When her sister advised her to call 911, the defendant told her not to call 911 but did not prevent her from placing any calls. Tyra Hampton went to Ms. Douglas' house. Tyra Hampton testified Ms. Douglas never suggested calling 911. While they waited for Ms. Douglas, Ms. Hampton asked the defendant to come to the hospital, but he said he could not. From the hospital, Ms. Hampton later called the defendant and told him she needed him, but he again said that he could not come to the hospital. Mr. Rayford was at the hospital and did not leave when medical personnel informed the family that the victim's injuries could not have been caused by a fall from the bed.

Ms. Hampton testified that when she first spoke with Lieutenant Terry Pirtle around

8:00 or 9:00 p.m., she told him that she was home alone with the victim, left him on the bed while she went to the bathroom, and heard a thump and found him limp on the floor. She testified she told him that because she believed the defendant's story and because she did not want to jeopardize her housing. She said that Lieutenant Pirtle did not believe her and threatened to take her to jail. Around 3:00 a.m. the next morning, Ms. Hampton called Lieutenant Pirtle and told him that the defendant had been with the victim the whole time. She testified she had never hit her baby in the head or spanked him. Ms. Hampton acknowledged she had kept in touch with the defendant after the victim's death; however, she testified she would not have done so if she had known prior to the week of the trial that he had confessed to hitting her child.

Terrika Hampton, Tyra Hampton's sister, also testified for the State. Terrika Hampton stated she had planned to go to the mall with Tyra Hampton and the defendant when she received a call from Tyra Hampton telling her that the victim would not wake up. She told her sister to call 911. Tyra Hampton called again when Terrika Hampton was on the expressway, and Terrika Hampton again told her to call 911. This time she could hear the defendant in the background in a panicked voice saying "what you going to call the ambulance for." Terrika Hampton heard her sister tell the police that the victim fell off the bed. Later, her sister told her that when she arrived home, the defendant was holding the victim in his hands and the victim was unresponsive. Terrika Hampton testified that Mr. Rayford was present at the hospital Friday, Saturday, and Sunday, but that she never saw the defendant despite overhearing her sister ask him to come. After the victim died, Terrika Hampton sent a text message to the defendant informing the defendant that the victim had died and telling him to turn himself in. The defendant responded with a text message saying "I told u i put him n da basinet n went 2 iron n then i heard him fall but he didnt cry so i tried shakin him 2 wake him up n calld u 100." Terrika testified that this meant "100 percent I'm telling you the truth." A photograph of the text message was introduced into evidence.

Lieutenant Terry Pirtle, who was assigned to the Juvenile Abuse Squad with the Memphis Police Department, testified that he interviewed both Mr. Rayford and Tyra Hampton, the victim's mother, at the hospital. Lieutenant Pirtle said that Ms. Hampton gave a statement that the baby was fine in the morning, that she had been receiving calls from the defendant while she was at work, and that the victim was fine when she got home and then fell off the bed. Lieutenant Pirtle asked Ms. Hampton to go to the apartment, and a technician photographed and measured the bed. While at the apartment, Lieutenant Pirtle requested that Ms. Hampton contact the defendant by telephone. When Lieutenant Pirtle attempted to speak with the defendant, the defendant merely stated that "whatever the mother says happened is what happened" and hung up the phone. Later in the night, at the hospital, Lieutenant Pirtle testified Ms. Hampton approached him and stated that the victim had not fallen off the bed in her presence but had been unresponsive when she got home. Lieutenant

-6-

Pirtle also spoke with Terrika Hampton, who informed him that she had overheard the defendant tell the victim's mother not to call 911. On cross-examination, Lieutenant Pirtle acknowledged that he might have said that someone would go to jail for the crime but denied threatening the victim's mother with jail.

Doctor Karen Chancellor, Chief Medical Examiner for Shelby County, performed the autopsy on the victim and testified as an expert witness. Dr. Chancellor testified that she found swelling and discoloration on the parietal region of the scalp which overlaid a nine-centimeter fracture of the victims skull. The victim's brain was extremely swollen, resulting in ischemic injury, and there was bleeding between the skull and brain. She also discovered bleeding around both optic nerves and hemorrhages in the retinas. She testified that retinal hemorrhages were consistent with blunt force injury to the head. She also testified that the autopsy revealed bruising in both buttocks. Dr. Chancellor concluded the victim died from blunt force injury to his head and ruled it a homicide. She testified that an 11-month-old could not get this type of severe injury by himself, noting that a fall from a roof might cause such an injury. Dr. Chancellor indicated that the injury could have occurred from twenty-four hours before the victim was taken to the hospital to immediately before; she opined that "[t]he further you go out beyond 12 [hours], I think it's less likely," but it was "not impossible" that the injuries occurred thirteen hours earlier. She placed the bruising to the victim's buttocks in the same general time frame. She testified the skull fracture could not have occurred a week prior to the victim's admission to the hospital because there would have been signs of healing. She also testified that the victim's bones were not softer than normal for a child his age.

Doctor Karen Lakin testified as an expert in pediatrics. She testified that a CT scan revealed that the victim had extensive bleeding on the right side of his head in the subdural area, a parietal skull fracture on the right side, and swelling in his brain. Dr. Lakin testified that these injuries would be the result of trauma. Dr. Lakin noted that the victim was not breathing, had no responses or pupillary reflexes, and "for all practical purposes[,] he was almost dead when he got to the hospital to begin with." Dr. Lakin further noted that given the critical nature of the victim's injuries, the victim would not have been able to eat, play, participate in a bath, stand, or cry after the injuries were inflicted. Dr. Lakin's testimony was that she would expect the baby to be symptomatic almost immediately. Dr. Lakin opined that the injuries were non-accidental and consistent with abusive head trauma. Dr. Lakin testified that this conclusion was bolstered by finding retinal schisis in the victim's right eye. Dr. Lakin testified that the fracture could be caused by accidental trauma such as a child falling three stories, but this wouldn't usually cause retinal hemorrhages. Given the combination of injuries, "the most likely explanation for that is abusive head trauma secondary to the result of some severe impact that may be associated with shaking and then sometimes we see it specifically just with severe shaking." Dr. Lakin noted that an acute subdural hemorrhage

can happen in as large as a 72-hour window, and that she would use information from the caregiver regarding the child's state of responsiveness to determine the time of the injury. However, she testified that in her opinion, the victim could not have sustained the injury 72 hours prior to arriving at the hospital, because he was not breathing and was non-responsive, and he could not have survived that long on his own.

Sergeant Willie Mathena, an officer with the Memphis Police Department, apprehended the defendant on March 3, 2009. Sergeant Mathena testified that he and several other officers had information that the defendant was at a particular apartment complex. Sergeant Mathena smelled a strong scent of marijuana. A door opened and a large cloud of smoke came out. Sergeant Mathena testified that "[i]t almost looked like a rock concert." When the smoke cleared, Sergeant Mathena recognized the defendant. Sergeant Mathena testified that the defendant was arrested because of the marijuana. Sergeant Mathena did not read the defendant his rights.

Sergeant Stark also testified at trial regarding the defendant's statement. Sergeant Stark testified that Lieutenant Pirtle had given him information about the case; as a result, he wanted to speak with the defendant because the defendant had been with the victim the whole day and because the defendant was not present at the hospital. On March 2, 2009, Sergeant Stark asked detectives to attempt to locate the defendant, and he spoke with Terrika Hampton. Sergeant Stark took a photograph of the text message from the defendant and took a statement from Terrika Hampton. Sergeant Stark then went to Tyra Hampton's place of employment to confirm that she had been at work on February 27, 2009, and found that she had clocked in at 9:52 a.m. and clocked out at 4:25 p.m. Sergeant Stark also heard from the medical examiner that the victim had a fracture to the right side of the skull and bruising on both buttocks. At 9:25 p.m. on March 3, 2009, he received a phone call that the defendant was in custody.

Sergeant Stark and Sergeant Lundy interviewed the defendant in a room with a large table while the defendant was shackled to a bench. The officers first determined he could read and then gave him a form advising him of his rights at 10:39 p.m.; the defendant initialed the form indicating he understood his rights and wished to speak with the officers. All three men signed. Sergeant Stark testified that if he had thought the defendant was under the influence of anything, he would not have proceeded with the interview, but would have waited for the following morning. Sergeant Stark stated he had no particular reason to speak with the defendant on the night of March 3 rather than the morning of March 4.

Sergeant Stark told the jury that the defendant initially told him that he had put the victim in the bassinet while he went to the bathroom. He said he heard the victim fall and shook the victim because he was unresponsive. Sergeant Stark stated that he told the

defendant that his account was untrue. The defendant began to cry, and Sergeant Stark got him a Sprite. At 11 p.m., the defendant told the officers that he had fed and bathed the victim, but the victim had started crying. The defendant spanked the victim at that point, and the victim stopped crying for a little while. The victim began crying again, and the defendant sat him on the ground and hit him in the back of the head several times. Sergeant Stark testified that he questioned the defendant regarding which hand he hit him with and where he was positioned to make sure the defendant's statement matched the physical evidence. According to Sergeant Stark, the defendant stated he hit the victim with his right hand while standing behind the victim. Sergeant Stark testified that the defendant stated he was angry and sounded frustrated that he could not get the baby to stop crying. At 11:40 p.m., a third detective came to type the defendant's statement. The defendant signed it at midnight.

The defendant's statement, which began with a waiver of rights, was admitted into evidence. In it, the defendant related that the day started well, but then the victim started crying. The defendant spanked him and left him alone for a while. The victim cried again, and the defendant spanked him again and then put him to sleep. The victim began crying uncontrollably. The defendant "hit him a couple of times like in the back of his head like in his neck to make him stop. And then still he wouldn't stop crying and then I shook him and then he lost life and I called his mother." The defendant's statement said that he hit the baby "no more than" ten times. The defendant's statement also noted that he had sent a text message to Tyra Hampton regarding what happened. The statement showed that the defendant affirmed that he had given it voluntarily without threats or promises. Sergeant Stark testified the defendant read over the statement but made no changes. Sergeant Stark also testified that none of the officers threatened, coerced, or mistreated the defendant. He stated that the time it took to get the defendant's statement was "extremely quick." He further testified that the defendant did not ever blame anyone else for the victim's injuries. On cross-examination, Sergeant Stark stated that he "wouldn't be surprised" if he had said that the defendant might go to jail for a long time if he stuck with his first story, because it didn't match up with the baby's injuries. He noted that because the defendant "was looking at first degree murder, the only thing that he could do was tell and help him" since there was no higher crime with which he could be charged.

The defendant testified on his own behalf. The defendant testified that he wanted to spend time with the victim and told Ms. Hampton he would keep him that day. The defendant testified that he had cared for the victim while Ms. Hampton was at work about twenty times in the past. The defendant testified that the victim had not fully awakened the night he was dropped off. The next morning, Ms. Hampton changed his diaper and gave him a bottle, and then he went back to sleep. The defendant testified that when the victim awoke, he fed him and gave him a bath; the defendant called Ms. Hampton because there was a ring around the tub, and that was unusual. The victim then took a nap, and the defendant fed him

again when he awoke. At that point, the victim began crying.

The defendant testified that the victim "was really spoiled. And if you put him down and stay away from him too long he would cry." The defendant called Ms. Hampton because in the past she had been able to calm the baby by speaking with him on the telephone. She spoke with the victim and he calmed down. The defendant sat with the victim for a while and then put him back on the floor around 3:00 p.m. The victim started screaming. The defendant testified that he then called Ms. Hampton again and asked her to come home. However, the employee who was to replace her could not come and Ms. Hampton had to stay longer. The defendant testified that he got tired of hearing the victim cry and so he held him to calm him down. The defendant said that Ms. Hampton got home and told him that her sister would be late for an outing they had planned, so the defendant decided to cut his own hair. The defendant was in the bathroom running the electric clippers when he heard Ms. Hampton screaming and came out and saw that the baby was limp. According to the defendant, Ms. Hampton told him that the victim was crying and threw up and that she spanked him and "lost it." The defendant testified that the victim frequently cried and occasionally threw up, and that Ms. Hampton would spank him. The defendant stated that he told Ms. Hampton to call 911, but she stated she didn't need them in her "business."

The defendant testified that he never went to the hospital because he had "a prior obligation with the police" and would have been arrested if he had been around a police officer. The defendant testified Ms. Hampton called him while he was riding the bus and they prayed together. The defendant stated that later Ms. Hampton and Lieutenant Pirtle called him and that he was willing to speak with Sergeant Pirtle over the phone; however, because Lieutenant Pirtle insisted that he be interviewed face-to-face, they did not talk. According to the defendant, he habitually smoked marijuana but never did so when he was taking care of a child.

The defendant confirmed that his interview after his arrest was not long, stating that he agreed to give a statement after ten to twenty minutes of questioning. The defendant repeated his testimony from the suppression hearing regarding Sergeant Lundy and testified he gave the statement because he did not want Ms. Hampton to have to go to jail and three years was "not that much time." He further confirmed his testimony from the suppression hearing that he was intoxicated from having smoked marijuana all day. He testified that he was not responsible for the victim's injuries. He confirmed he had sent the text message to Terrika Hampton. On cross-examination, the defendant claimed that the police told him what to say when he gave his statement. He claimed that he never spanked the victim. To impeach the defendant, the prosecution read the defendant's testimony from the suppression hearing at which the defendant admitted spanking the victim. The defendant stated that he was not truthful at the suppression hearing. The prosecution also read part of a letter which

the defendant acknowledged writing to Tyra Hampton after his arrest; the defendant had written, "It's like I get sad but that's it.  I get a lot of headaches now.  Then I be trying to remember what happened and I can't."  He conceded he had never before stated that Ms. Hampton was responsible for the victim's injuries.

The jury convicted the defendant of felony murder committed in the perpetration of aggravated child abuse, of aggravated child abuse, and of aggravated child neglect.  The trial court merged the aggravated child abuse and aggravated child neglect charges and sentenced the defendant to fifty-one years incarceration for the felony murder and to a concurrent twenty years for the aggravated child abuse.  On appeal, the defendant challenges the sufficiency of the evidence supporting the first degree murder conviction; the defendant does not challenge the sufficiency of the evidence supporting his conviction for aggravated child abuse.  The defendant also asserts that certain photographs of the victim were admitted in error and that the court should have suppressed his statement to the police.

**Analysis**

**A. Sufficiency of the Evidence**

This Court must set aside a guilty verdict if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt.  Tenn. R. App. P. 13(e).  In reviewing the sufficiency of the evidence upholding a conviction, the pivotal question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  The State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences drawn therefrom. *State v. Williams*, 38 S.W.3d 532, 536 (Tenn. 2001).  The Court may not re-weigh or re-evaluate the evidence, or substitute its inferences for those drawn by the trier of fact. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992).  "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact," and a guilty verdict rendered by the jury and approved by the trial judge resolves all conflicts in testimony in favor of the State's theory. *State v. Schmeiderer*, 319 S.W.3d 607, 635 (Tenn. 2010) (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)).  A guilty verdict replaces the presumption of innocence with one of guilt, and the defendant bears the burden of showing that the evidence is insufficient to support the verdict. *Id.*

This case does not present a close question regarding whether there was sufficient evidence to support the verdict.  The defendant's challenge is based solely on the contention that the proof was not sufficient to show that the defendant was the person responsible for

the victim's injuries. The defendant's own testimony blamed the victim's mother for the injuries. However, the evidence at trial also included the defendant's signed statement to the police stating that he was responsible for the injuries, along with Sergeant Stark's testimony that the statement was voluntary; the defendant's text message to the victim's aunt in which he asserted that he shook the victim, who had fallen from a bassinet; the victim's mother's testimony that the victim was behaving normally in the morning but was unresponsive when she got home and that the defendant had told her the victim fell out of bed; and the victim's mother's and victim's aunt's testimony that the defendant did not want the mother to call 911. Although the defendant testified to a different version of events, this conflict in testimony is a classic credibility determination entrusted to the jury. This issue has no merit.

### B. Admission of Photographs of the Victim

The defendant next objects to the admission of two photographs of the victim taken during the autopsy. One photograph depicted the victim's skull with the scalp removed to expose a fracture in the bone. The other depicted the bruising on the victim's buttocks. Prior to admitting the photographs, the trial court held a hearing out of the presence of the jury. The trial court found that although the skull was "uncleaned" there was "not a lot of gore"; the trial court cut away part of that photograph which, by implication, it felt might be unfairly prejudicial. Regarding the other photograph, the trial court cautioned the prosecution to have the witnesses clarify which marks which were not wounds allegedly inflicted by the defendant. The prosecution also made a offer of proof, submitting to the court other, more prejudicial photographs which it was not attempting to enter into evidence. The trial court, finding that the probative value was not substantially outweighed by the possibility of unfair prejudice, admitted the photographs.

In Tennessee, the default rule is that all relevant evidence – which is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable – is admissible. Tenn. R. Evid. 401, 402. Relevant evidence may nevertheless be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Courts in Tennessee follow a policy of liberality in the admission of photographic evidence. *State v. Cole*, 155 S.W.3d 885, 912 (Tenn. 2005) (appendix). The decision to admit photographs into evidence lies in the sound discretion of the trial court, and the trial court's decision is reviewed for abuse of discretion. *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). Generally, "photographs of the corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying

character." *Id.* at 950-51. However, a photograph which is not relevant to the prosecution's proof is, like other non-relevant evidence, not admissible, and should not be admitted solely to prejudice the jury against the defendant. *Id.* at 951; Tenn. R. Evid. 402. Although it may appear that photographs of crime victims are prejudicial by their very nature, it is not necessary to exclude all such photographs; indeed any evidence tending to establish the defendant's guilt may be termed prejudicial. *State v. Williamson*, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995). "What is excluded is evidence which is unfairly prejudicial, in other words, evidence which has an undue tendency to suggest a decision on an improper basis, frequently, though not necessarily, an emotional one." *State v. Jordan*, 325 S.W.3d 1, 85 (Tenn. 2010) (appendix). "[A]s a general rule, where medical testimony adequately describes the degree or extent of the injury, gruesome and graphic photographs should not be admitted." *State v. Morris*, 24 S.W.3d 788, 811 (Tenn. 2000) (appendix). However, a relevant photograph is not excluded merely because it is cumulative of testimonial evidence. *Id.*

At trial, the evidence showed that the defendant initially told the victim's mother, the victim's aunt, and the police that the victim sustained his injuries when he fell out of the bed or bassinet and the defendant shook him to try to awaken him. The photographs in question are relevant to showing the non-accidental nature of the victim's injuries. Given the defendant's testimony at the suppression hearing and in his statement that he "spanked" the victim, the photograph of the bruising is also relevant to the question of the identity of the person responsible for the injuries. The photographs further corroborate the defendant's confession. We conclude that the trial court did not abuse its discretion in admitting the photographs.

### C. Admissibility of the Defendant's Statement

The defendant also contends that his statement was involuntary and should not have been admitted into evidence for two reasons: because he was intoxicated at the time, and because he was influenced by threats and promises from the police officers questioning him. The trial court made a credibility determination in favor of the testifying police officer during the suppression hearing and found that the defendant's statement was given voluntarily. The statement was subsequently introduced at trial.

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). These safeguards include that, prior to interrogation, "the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an

attorney, either retained or appointed." *Id.* A waiver of the constitutional right to silence must be made voluntarily, knowingly, and intelligently. *State v. Turner*, 30 S.W.3d 355, 359 (Tenn. Crim. App. 2000). Such a waiver is valid if the suspect is aware of the nature of the right and the consequence of the decision to abandon the right. *State v. Thacker*, 164 S.W.3d 208, 249 (Tenn. 2005) (appendix). In evaluating the voluntariness of a waiver, the court must look at the totality of the circumstances. *Turner*, 30 S.W.3d at 359. Here, the court found the defendant's statement to be voluntary, and the trial court's determination at a suppression hearing is presumptively correct on appeal, unless the evidence preponderates otherwise. *See State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996).

Intoxication is, of course, part of the totality of the circumstances examined in evaluating the voluntariness of a confession. However, intoxication, standing alone, is not a sufficient reason to suppress the defendant's statement if the evidence shows that the defendant understood his rights. *State v. Bell*, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985). As long as the statement is coherent, *State v. Perry*, 13 S.W.3d 724, 738 (Tenn. Crim. App. 1999), as shown by the fact that the accused was capable of narrating events and stating his own participation, the statement is admissible. *State v. Green*, 613 S.W.2d 229, 232-233 (Tenn. Crim. App. 1980). "It is only when an accused's faculties are so impaired that the confession cannot be considered the product of a free mind and rational intellect that it should be suppressed." *State v. Morris*, 24 S.W.3d 788, 805 (Tenn. 2000) (appendix) (quoting *State v. Robinson*, 622 S.W.2d 62, 67 (Tenn. Crim. App. 1980)).

The evidence does not preponderate against the trial court's determination that any purported intoxication on the part of the defendant did not render the statement involuntary. The defendant's own testimony at the suppression hearing was that, in spite of his intoxication, he understood his rights, he had no problem understanding his rights, and he wished to give a statement to the police. The trial court further determined that it did not find him to be a credible witness because of his demeanor and because the amounts of intoxicants he claimed to have ingested were too large to credit. Sergeant Stark testified that the defendant did not appear intoxicated and the defendant was able to narrate the events leading to the victim's injuries. The defendant was not so intoxicated as to jeopardize the voluntariness of his statement, and we conclude the trial court did not err in denying his motion to suppress on this ground.

The defendant next asserts that his statement should have been suppressed because of threats of lengthy imprisonment and promises of leniency made by the prosecution. Even when a defendant has waived his *Miranda* rights, a confession must still be voluntary in order to be admissible. *State v. Smith*, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000). A confession may not be compelled by "any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence."

-14-

*Id.* (quoting *Bram v. United States*, 168 U.S. 532, 542-43, (1897)). Article I, section 9 of the Tennessee Constitution provides a test of voluntariness that is broader and more protective of individual rights than that found in the Fifth Amendment. *State v. Downey*, 259 S.W.3d 723,734-35 (Tenn. 2008). Nevertheless, promises of leniency do not render subsequent confessions invalid *per se*, because "[t]he Fifth Amendment does not condemn all promise-induced admissions and confessions; it condemns only those which are *compelled* by promises of leniency." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (internal quotation omitted). "The essential question therefore is 'whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined." *State v. Downey*, 259 S.W.3d at 734 (internal quotation omitted). One factor to be assessed in determining whether the confession was voluntary under the totality of the circumstances is whether there are any indicia the defendant subjectively understood and waived his rights. *Id.*

Here, Sergeant Stark conceded that he might have told the defendant that he faced lengthy prison time if he continued to insist on his original story because it did not match the physical evidence. However, "[t]ruthful statements about [a defendant's] predicament are not the type of 'coercion' that threatens to render a statement involuntary." *Smith*, 933 S.W.2d at 456 (quoting *United States v. Pelton*, 835 F.2d 1067, 1073 (4th Cir. 1987)). The defendant testified that Sergeant Lundy promised him that he would only face three years in prison if he confessed, but would face fifty-one if he did not. The trial court, however, did not credit the defendant's testimony at the suppression hearing, a finding supported by the defendant's testimony at trial that he had perjured himself at the suppression hearing on the subject of the "spanking." Sergeant Stark also testified that he believed that the defendant would be charged with first degree murder and "the only thing that he could do was tell and help him[self]." Sergeant Stark acknowledged telling the defendant that the charge "could change." However, such a statement is equivocal. *See Smith*, 933 S.W.2d at 456 (finding statement that the DA often did not prosecute similar cases was equivocal). The trial court implicitly found that these statements did not compel the confession. Given the totality of the circumstances, including the extreme brevity of the interrogation and the defendant's suppression hearing testimony that he understood his rights but nevertheless wished to make a statement, the evidence does not preponderate against the trial court's determination that the defendant's will to resist was not overborne by law enforcement and that the statement was voluntarily given.

**CONCLUSION**

Based on the foregoing, the defendant's convictions and the trial court's rulings regarding the admission of the photographs and the admission of the defendant's statement are affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE