IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 24, 2022 Session

## STATE OF TENNESSEE v. DEVONDRE DEQUAN SAMUEL

**Appeal from the Criminal Court for Knox County**
**No. 112549   G. Scott Green, Judge**

_____

**No. E2020-01033-CCA-R3-CD**

_____

Defendant, Devondre DeQuan Samel, was convicted by a jury of conspiracy to possess 150 grams or more of heroin with intent to sell or deliver within 1,000 feet of a school, a park, and a recreational center (Counts 1-3), conspiracy to sell 150 grams or more of heroin within 1,000 feet of a school, a park, and a recreational center (Counts 5-7), two counts of possession of drug paraphernalia (Counts 14 and 17), possession with intent to sell or deliver less than fifteen grams of heroin within 1,000 feet of a park (Count 15), and manufacture of less than fifteen grams of heroin within 1,000 feet of a park (Count 16). The trial court imposed an effective fifteen-year sentence, as a Range I standard offender, to be served in the Department of Correction. On appeal, Defendant argues: that the trial court erred by denying his motion for judgment of acquittal; that the trial court erred by denying his pre-trial motion for a continuance; that the trial court improperly limited his cross-examination of Mr. Berry; that his sentence under the Drug-Free School Zone Act constitutes cruel and unusual punishment; and that the trial court erred by denying his motion for a new trial based upon prosecutorial vindictiveness. Following our review of the entire record and the briefs of the parties, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J. and TIMOTHY L. EASTER., J., joined.

John M. Boucher, Jr., Knoxville, Tennessee, for the appellant, Devondre Samuel.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Senior Assistant Attorney General; Charme Allen, District Attorney General; and Molly Martin and Kenneth Irvine, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case arises from multiple transactions involving the sale of heroin. Defendant was indicted for conspiracy to possess 150 or more grams of heroin within 1,000 feet of a school (Counts 1 and 5), a park (Counts 2 and 6), a recreational center (Counts 3 and 7), and a child care agency (Counts 4 and 8). He was also indicted for possession of marijuana (Count 13), possession of drug paraphernalia (Counts 14 and 17), possession with intent to sell or deliver less than fifteen grams of heroin within 1,000 feet of a park (Count 15), and manufacture of less than fifteen grams of heroin within 1,000 feet of a park (Count 16). Defendant was tried along with Co-defendant Denzel Washington. The State dismissed Counts 4 and 8, and the jury convicted Defendant as charged in Counts 1-3, 5-7, and 14-17. Defendant was acquitted of Count 13.

At trial, Investigator Phillip Jinks of the Knoxville Police Department ("KPD"), Organized Crime Unit, Narcotics Division, testified as an expert in narcotics investigations. He explained that heroin is usually purchased in "points" and one point is ".1 gram or a tenth of a gram." Investigator Jinks testified that heroin distributors often prepackage the heroin for sale in plastic bags called "bindles," the corners of a sandwich bag called a "corner baggie[s]," or into folded pieces of paper such a lottery ticket play slip. He said heroin is frequently mixed with fentanyl which is another controlled substance and cheaper than heroin. Michigan is the primary source of heroin in East Tennessee.

Investigator Jinks testified that the "goal of the typical heroin distributor is to - - is to try to remain anonymous to its customers." They remain anonymous by not owning property in the area or by driving cars that have been rented in the addict's name. The addicts also rent hotel rooms for the distributors to use to distribute the drugs. Investigator Jinks explained that heroin distributors often use nicknames and multiple "burner" cell phones not associated with their names. He said, "And they use that phone to communicate with drug customers. And they change that phone number very frequently."

Investigator Jinks testified that in 2015, he began receiving pieces of information from various sources about a group of individuals ("the drug conspiracy") who were distributing heroin and using nicknames that he had not heard before. The first group of nicknames consisted of "Jefe, Drizzy, Sport, Stroke, Shorty and Ice." Investigator Jinks was eventually able to positively identify all of the individuals.[1] "Drizzy" was identified as Defendant, and "Jefe" was identified as Co-defendant Denzel Washington, and they were both at the top level of the drug conspiracy. The next level of individuals in the drug conspiracy included Curtis Britton (Stroke), Tyrell Mason (Thoroughbred), Jeffrey Brandon Berry, Jordan Lee (Sport), Chris Adams (Shorty), and Bobby Wilson. The lower level distributors and users in the bottom of the drug conspiracy were Matia Goins, who

---

[1] At trial, Investigator Jinks presented a three-tiered chart that included the individuals' actual names, nicknames, and level within the drug conspiracy.

was Defendant's one-time girlfriend, Jennifer Naylor, James Brady Baggett, and James Christopher Cagle. Investigator Jinks testified that he interviewed most of the individuals involved in the drug conspiracy, including Mr. Cagle, Mr. Berry, Ms. Goins, Ms. Naylor, and Mr. Baggett, and they all cooperated with the investigation.

On April 13, 2017, Investigator Jinks conducted an undercover drug buy at the Broadway Shopping Center located at 2001 North Broadway Street, with a confidential informant ("CI"), who had arranged the buy. Investigator Jinks testified that before the buy, the CI made two calls to one of the co-conspirators, who said that he did not have any drugs and would have to turn the matter over to Defendant (Drizzy). Investigator Jinks noted that the Broadway Shopping Center is across the street and within 1,000 feet from Fulton High School. He observed the CI purchase one gram of cocaine for $200 through a "hand-to-hand" transaction in the parking lot with the seller who was driving a silver car that had been rented by Ms. Naylor. Investigator Jinks was unable to identify the driver of the vehicle.

A second controlled drug buy with the CI occurred on June 14, 2017, in the breezeway of the Crossroads West Apartments. The CI was accompanied by an undercover officer, and the buy was monitored by Investigator Jinks. Prior to the transaction, the CI called Mr. Lee at a Michigan number. The sellers arrived at the apartment complex in a vehicle with a New York license plate driven by Mr. Adams. Investigator Jinks testified that the CI purchased .91 grams of heroin packaged in a "lottery ticket play slip."

Investigator Jinks testified that he drove to Mr. Cagle's residence at 4513 Sullivan Road on August 23, 2017, to arrest him on an outstanding warrant. He also had reason to believe that Mr. Cagle was involved in the drug conspiracy. Mr. Cagle agreed to cooperate with Investigator Jinks' investigation by "making recorded phone calls and monitored text messages with a person he knew as Drizzy [(Defendant)], to coordinate the delivery of heroin to his residence." Investigator Jinks testified that Mr. Cagle's residence was located within 1,000 feet of Cumberland Estates Park and Cumberland Estates Recreation Center, a drug-free zone.

At trial, recorded phone calls made on August 23 between Mr. Cagle and Defendant were played for the jury. Concerning one call, Investigator Jinks testified:

> So, initially, the very beginning of that - - it was actually the end of the previous snippet that we heard, when Mr. Cagle says, "Can you come through?" He says, "Yeah" - - the [D]efendant says, "Yeah. I hear you. What are you trying to do?" Again, very common language for, what do you need? What are you trying to buy? Something that we've - - I've heard hundreds and thousands of times in reference to drug buys, what are you trying to do? And the

response is "40." And then [Defendant] says, "All right. I'm on my way."

Then [Defendant] says, "Call some people and line some shit up." Based on the totality of the circumstances of this case and my knowledge of the activity of these drug conspiracies, I believe that to mean telling Mr. Cagle to get some people lined up to make some buys. That's why he's wanting to get stuff popping, because his birthday's the next day. So he says, "Line some shit up." And then Mr. Cagle says, "All right. I got you."

Investigator Jinks testified that during the call, Defendant also vouched for the quality of the heroin by saying, "You can put your word on this shit." Investigator Jinks further testified:

That means in the drug world, as I said before, as I said yesterday, drug distributors want to tout the quality of their product. And he's telling Mr. Cagle, you can - - you can vouch to the people that you get lined up for the quality of this - - this dope. And then Mr. Cagle says, "That shit A1, real shit." A1 is something we hear a lot for high quality. Like I said yesterday, Fire is also something you hear a lot when somebody's touting the quality of their substance. A1 is something that's frequently heard when referring to the high quality of heroin.

Defendant then told Mr. Cagle that he would see him "in a few." Investigator Jinks testified that in a second call, Mr. Cagle asked Defendant how long it would be before he arrived. Defendant replied that he would be there in twenty minutes because he was dealing with a million more motherf[- - -]kers." To Investigator Jinks, this meant that Defendant had a lot of deliveries of heroin to make before he arrived at Mr. Cagle's house. Mr. Cagle then told Defendant that he had "enough for a half," which was slang for a half gram of heroin. Defendant replied: "All right. I'll be over there. I promise you."

Investigator Jinks and other officers conducted surveillance on Mr. Cagle's residence and observed a silver Dodge Challenger, which was the type of vehicle Investigator Jinks had information that the drug conspirators were using, pull into Mr. Cagle's driveway with Mr. Berry driving and Defendant riding in the passenger seat. Another individual was riding in the backseat. Investigator Jinks and the other officers immediately approached the vehicle and detained the occupants and searched the vehicle. They found two cell phones in the floorboard where Defendant had been sitting. One of the phones, a white LG phone, was associated with the phone number that Mr. Cagle called to reach Defendant. Investigator Jinks testified that there were five to six additional cell phones in the car, and one showed a missed call from "Punch," another CI in this case.

There were also several sets of digital scales in the car, including one that had been sitting at Defendant's feet. There was a hypodermic syringe and a spoon found on the driver's side of the vehicle and a plastic bottle containing what appeared to be a small amount of marijuana near where Defendant had been seated. Investigator Jinks testified that there was a Walmart gift card and an Electronic Benefits Transaction card in the Challenger, which is commonly "used as currency for drugs, typically by addicts who either get them as gifts or return stolen property and obtain gift cards and then use them as currency to purchase drugs." Investigator Jinks searched Defendant "incident to arrest" and found approximately $3,000 in his pants pocket. He did not find any heroin on Defendant's person or in the vehicle.

Mr. Cagle provided his cell phone to Investigator Jinks who used Cellebrite Software to extract information from the phone to generate reports introduced at trial. One report contained text messages between Mr. Cagle's phone and one of the iPhones found in the Challenger. The messages contained numerous references to the purchase and sale of heroin using common slang terms such as "pt" for a point, which is 0.1 gram of heroin, "grizzi" for a gram of heroin, and "100 to G" referring to $100 for a gram of heroin. Investigator Jinks noted that the various cell phones were passed around among the participants in the drug conspiracy.

Investigator Jinks testified that a report generated from Mr. Cagle's contact list contained cell phone numbers for Defendant under various forms of Defendant's nickname such as "Driz," "Drizz," and "Drizzzee." He said that the phone number associated with "Driz" was the number that Mr. Cagle called to arrange the transaction on August 23rd. An additional report containing approximately 350 text messages from two phone numbers associated with Defendant (Drizz) had numerous references to drug sales.

Investigator Jinks testified that Mr. Berry also cooperated with the drug conspiracy investigation and turned his cell phone over to Investigator Jinks who extracted information from the phone to generate reports concerning this case. He said that the phone contained text messages concerning drug sales which were exchanged with the phone number associated with the LG phone found in the Challenger and showed a contact name of "Cell Drizzy." Investigator Jinks testified that a text sent to Mr. Berry from "Cell Drizzy" on August 22, 2017, read: "I got subs and some shit in that's A1 fire." Investigator Jinks explained: "Subs is probably a reference to Suboxone strips, which is a controlled substance that's usually used for the treatment - - for treatment of addiction. But it is - - it is widely abused as well." He said that "A1 fire" refers to high quality heroin. There were also text messages on Mr. Berry's phone from Mr. Lee who asked Mr. Berry for some "fire" or heroin.

Investigator Jinks identified a Facebook page associated with Defendant. There was a photograph on the page showing Defendant backed into the driveway at Mr. Cagle's house on Sullivan Road titled "#trapstar." Investigator Jinks testified: "Trap is a - - is a

location where drugs are sold. And, also, trap, it can also be used as a verb. That's selling drugs."

Investigator Jinks testified that he extracted information from the LG phone found in the Challenger and generated reports. There were several texts on the phone in reference to Mr. Berry about buying a car and a photograph of the receipt for a wire transfer made by Ms. Goins to Demetrius Bailey in Michigan. Investigator Jinks testified that one text message between Defendant and Mr. Baggett contained the phone number for one of the other phones found in the Challenger. Mr. Baggett was also sending wire transfers. Investigator Jinks testified that the LG phone contained numerous other text messages between Defendant, Mr. Baggett, Mr. Cagle, and other members of the drug conspiracy concerning the sale of heroin. There were additional reports from Defendant's phone containing text messages with numerous other individuals who appeared to be buying heroin from Defendant. There was also a video of Defendant and Mr. Berry on the phone. Investigator Jinks admitted that he did not find any references to Co-defendant Washington's name or any of his aliases in Defendant's phone.

Investigator Jinks testified that he interviewed Mr. Berry on August 23, 2017. Based on the information that he received from Mr. Berry and other sources, Investigator Jinks drove to an apartment complex located at 3213 River Maple Way the following day. There, he located a blue Dodge Charger in the parking lot with a temporary tag from a car lot on Clinton Highway with Mr. Berry listed as the buyer. The vehicle was parked within 1,000 feet of the recreation area or playground at Holston Park. Investigator Jinks obtained and executed a search warrant on the vehicle. He recovered a set of Fusion digital scales in a pouch; a sock containing 29.95 grams of heroin; a bag containing a cutting agent; a powder or pollen press containing 21.73 grams of heroin; a CVS receipt for the purchase of Sleepinal, which is an over-the-counter sleep medication often used as a cutting agent for heroin; and box of Unisom sleep medication. Investigator Jinks testified that the "street value" of the heroin was approximately $18,000.

Investigator Jinks conducted another drug buy on September 11, 2017, at the Deane Hill Apartments on Gleason Drive using the same CI as he used on April 13, 2017, and the transaction was monitored and recorded. The CI purchased .82 grams of a heroin and fentanyl mix for $200 from Mr. Adams. Investigator Jinks conducted a second drug buy on September 21, 2017, at an abandoned gas station on Kingston Pike with Mr. Adams using a different CI. Investigator Jinks observed the "hand-to-hand" exchange between the CI and Mr. Adams of 1.27 grams of a heroin and fentanyl mix for $270. The car that Mr. Adams was riding in, along with Mr. Wilson, had a Massachusetts license plate and was the same vehicle used during the previous buy on September 11. The phone number that the CI called prior to the drug buy was stored as "Jefe 9417" in the CI's phone. There were several text messages exchanged between the CI and the number associated with Jefe that appeared to reference the drug buy.

On cross-examination, Investigator Jinks testified that both the Dodge Challenger and Dodge Charger used during the drug buys were purchased by Mr. Berry at Defendant's direction. He said that Defendant stood behind Mr. Berry during the purchases and provided the money. Tonya Stafford, an employee of Easy Auto Sales on Clinton Highway, testified that Mr. Berry purchased the Charger in June 2017 and the Challenger on August 21, 2017. Defendant was with Mr. Berry during both purchases.

Mr. Baggett identified Defendant as "Drizzy" and Co-defendant Washington as "Jefe" and said that he had known both men since 2015. Mr. Baggett testified that he was a drug addict, and his choice of drug was heroin. He identified his phone number and said that he would contact Defendant or Co-defendant Washington for heroin. He had several contact numbers for them and usually purchased one-half to one gram two to three times per week for which he paid $80 and $140 respectively. Mr. Baggett testified that he purchased drugs from Defendant or Co-defendant Washington from 2015 until his arrest in 2017, and that Defendant, Co-defendant Washington, or one of their associates delivered the drugs to him either to his house or he met them in Knoxville.

Mr. Baggett testified that Defendant and Co-defendant Washington called him by the nickname "Brady." He identified himself as the "C. Brady" who exchanged text messages with Defendant. One message from Defendant read: "Hey, I'm back in town. Hit me up. It's fire." This meant that Defendant had good heroin. Another message read: "Stroke can bring it right now. I'm about to jump in the shower. What you wanting?" Mr. Baggett testified that he had seen Stroke (Chris Britton) with Defendant and Co-defendant Washington, and Stroke was someone who dealt drugs with them.

Mr. Berry testified that in 2015 he had been a drug addict for approximately ten years, and he used opiates, heroin, and pain pills. After being fired from his job, he "would drive drug dealers around to get drugs from them." Mr. Berry admitted that he also committed thefts to pay for drugs. He said he first met Defendant and Co-defendant Washington approximately seven years ago when he was buying pain pills for someone named "Chris," and Defendant and Co-defendant Washington gave him some heroin to try. Mr. Berry testified that he purchased heroin from 2015 until 2017. He purchased "anywhere between a point, $20 worth, up unto - - up to a gram. It's almost 200." Mr. Berry testified that he obtained the money to purchase the heroin by driving Defendant and Co-defendant Washington around in a blue Dodge Charger.

Mr. Berry testified that he stopped purchasing heroin from Co-defendant Washington sometime in 2015 and began solely purchasing the drug from Defendant. He said that Defendant conducted drug sales at Mr. Berry's house on Hickey Road in Knoxville. He identified Mr. Britton, Mr. Baggett, and Mr. Cagle as also being involved in the distribution of drugs, and he had purchased heroin from Mr. Britton. Mr. Berry testified that he purchased a blue Dodge Charger and a silver Dodge Challenger using

money that Defendant had given him. The temporary tag for the blue Charger was in Mr. Berry's name.

Mr. Berry identified text messages exchanged between him and Defendant. One text message from Defendant read: "I got subs and some shit in that's A1 fire." Mr. Berry explained that "subs" referred to Suboxone and "A1 fire" referred to heroin. He also identified a cell phone video during which Defendant said, "I'm going to put you to work today." This meant that Mr. Berry was going to drive Defendant around to conduct drug deals. Defendant also said, "You want to get a lot of work done when you want to get high, too." Mr. Berry testified that he sometimes drove Defendant to Michigan to "reup on drugs." He said, "And the last time I went with him, he had me try the different ones [(heroin)] to tell him which one was the best." Mr. Berry testified that he purchased Sleepinal tablets at CVS for Defendant on August 20, 2017, which Defendant and Co-defendant Washington used to cut heroin. He identified himself and Tyrell Mason on the video from CVS.

Mr. Berry testified that he was driving the silver Challenger on August 23, 2017, and he and Defendant drove to Mr. Cagle's house to deliver some heroin. He said that when the police pulled up behind them, Defendant put the heroin in his pants. Mr. Berry testified that he spoke with Investigator Jinks and told him where the blue Charger was located. Mr. Berry said that he often saw Defendant with large amounts of cash.

Ms. Naylor testified that she was an addict and met Defendant through a mutual friend. She bought heroin from Defendant from the end of 2016 until April or May of 2017. She would either pay cash or drive Defendant to various places to sell heroin in exchange for the drug. Ms. Naylor thought that she paid twenty to thirty dollars "a point." She also purchased heroin from Mr. Britton. Ms. Naylor admitted that she sometimes committed thefts to get items or money to buy heroin or methamphetamine, which she also used. She said that she rented a car for Defendant and Mr. Britton from Enterprise in March or April of 2017 for a period of one-month. Defendant paid for the car, and Ms. Naylor turned the car over to the two men.

Mr. Cagle testified that he had known Defendant since 2015 but he did not know Co-defendant Washington. Mr. Cagle said that he had been a drug addict since the age of fifteen, and he had overdosed multiple times, including overdosing on heroin provided to him by Defendant. He admitted that he had a lengthy criminal record. Mr. Cagle testified that he purchased heroin from Defendant daily until Mr. Cagle was arrested in his driveway. He said that he would text Defendant to request the heroin, and Defendant would bring it to Mr. Cagle's residence on Sullivan Road. Defendant usually arrived in various vehicles, and Defendant had more than one phone.

Mr. Cagle identified other members of the drug conspiracy who he met through Defendant. He gave Investigator Jinks permission to analyze his phone, and he identified

the phone numbers and various nicknames associated with Defendant from his contact list. Mr. Cagle testified that he sent text messages to Defendant, and he identified one text message that referred to Suboxone. He said that Defendant usually referred to heroin as "[f]ire." Mr. Cagle testified that if he texted Defendant "hit me up," Defendant understood that he wanted heroin. He identified a recorded phone call that he made to Defendant. During the call Defendant said, "Get it popping. I need some snaps." This meant that Defendant wanted him to get customers for him. Mr. Cagle said that he sometimes drove Defendant around in various vehicles, including the Charger, and he drove Defendant to Pontiac, Michigan to try out heroin for Defendant. Mr. Cagle testified that Defendant asked if the heroin was "A1," which meant "[t]op shelf." The heroin that Mr. Cagle tried became Defendant's new product to sell.

Chris Halcomb, a database and landbase administrator for the Knoxville Utilities Board, Geographic Information System (KGIS), testified that part of his duties included using a computer program to create maps of different areas in Knox County. He further testified as to how the maps are created. While he did not create the maps used in this case, his partner at KGIS created three standard aerial maps from their database using a computer program to show the proximity of 4513 Sullivan Road, 3213 River Maple Way, and 2001 North Broadway to parks, including greenways, a recreational center, and a school. The maps included transparent overlays showing 1,000-foot buffer zones from the addresses to parks and schools and separate overlays showing 1,000-foot buffer zones from greenways. Mr. Halcomb testified that, as shown on the map, 4513 Sullivan was located within 1,000 feet of Cumberland Estes Park, which includes a recreational center. The map also showed the 1,000-foot greenway buffer, and the recreational center was shown between the greenway and the boundary of the park closest to 4513 Sullivan Road. The map showed that 3513 River Maple Way was located within 1,000 feet of Holston River Park and Holston River Greenway. The map showed that that 2001 North Broadway Street was located within 1,000 feet of Fulton High School and within 1,000 feet of First Creek Greenway. Mr. Halcomb testified that the accuracy of the aerial photography was within one foot "horizonal distance."

On cross-examination, Mr. Halcomb testified that the buffer zones of the map radiated from a point or extended from a parcel boundary, and it appeared that the buffer zone for Fulton High School radiated from a point at the top of the building. The parties stipulated that the Cumberland Estates Park and its recreational center were a park and recreational center; the Holston River Park was a park; and the Fulton High School was a school used for educational purposes.

Based on the above evidence, the jury convicted Defendant of conspiracy to possess 150 or more grams of heroin within 1,000 feet of a school (Counts 1 and 5), a park (Counts 2 and 6), a recreational center (Counts 3 and 7), and a child care agency (Counts 4 and 8), possession of drug paraphernalia (Counts 14 and 17), possession with intent to sell or deliver less than fifteen grams of heroin within 1,000 feet of a park (Count 15), and

manufacture of less than fifteen grams of heroin within 1,000 feet of a park (Count 16). The jury acquitted Defendant of possession of marijuana (Count 13). Defendant timely appealed his convictions.

## ANALYSIS
## I.     Judgment of Acquittal

Defendant argues that the trial court erred by denying his motion for judgment of acquittal. His sole challenge to the sufficiency of the evidence is that the State failed to prove that "the controlled drug buys occurred within 1,000 feet of the real property that comprises a school and park[,]" which subjected him to enhanced sentencing under the Drug-Free School Zone Act in effect at the time of the offenses. The State contends that the trial court properly denied Defendant's motion for judgment of acquittal.

The standard of review for a trial court's denial of a motion for a judgment of acquittal is the same as the "standard that applies on appeal in determining the sufficiency of the evidence[.]" *State v. Little*, 402 S.W.3d 202, 211 (Tenn. 2013). When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011).

Because the jury's verdict replaces the presumption of innocence with one of guilt, the burden on appeal is shifted onto Defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). Thus, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)). Questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Reid*, 91 S.W.3d at 277 (quoting *Bland*, 958 S.W.2d at 659). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.* The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

"It is an offense for a defendant to knowingly... [d]eliver a controlled substance; ... [s]ell a controlled substance; or ... [p]ossess a controlled substance with intent to manufacture, deliver or sell the controlled substance." T.C.A. § 39-17-417(a)(2)-(4). Heroin is a schedule I controlled substance. *Id.* § 39-17-406(c)(11). The jury may infer from the amount of the drugs, along with the relevant facts surrounding the arrest, that the drugs were possessed for the purpose of selling or otherwise dispensing them. *Id.* § 39-17-419; *see also State v. Holt,* 691 S.W.2d 520, 522 (Tenn. 1984). The offense of conspiracy is committed if two or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one or more of them will engage in conduct which constitutes such offense. T.C.A. § 39-12-103(a). It is also required that "an overt act in pursuance of such conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired." T.C.A. § 39-12-103(d).

The Drug-Free School Zone Act in effect at the time Defendant committed the offenses provided that when the offense occurs within 1000 feet "of the real property that comprises a public or private elementary school, middle school, secondary school, . . . recreational center or park," the defendant "shall be punished one (1) classification higher" but "shall not be subject to additional incarceration." T.C.A. § 39-17-432(b)(1), (3). The defendant "shall be required to serve at least the minimum sentence for the defendant's appropriate range." T.C.A. § 39-17-432(c).

The Drug-Free School Zone Act does not create a separate criminal offense but "merely imposes a harsher penalty for violations of Tenn[essee] Code Ann[otated section] 39-17-417 occurring within a [drug-free] zone." *State v. Smith*, 48 S.W.3d 159, 168 (Tenn. Crim. App. 2000); *see* T.C.A. § 39-17-432(b). Therefore, "proof that the drug crime was committed in a [drug-free] zone is not an essential element of the 39-17-417 offense." *State v. Arturo Jaimes-Garcia*, No. M2009-00891-CCA-R3-CD, 2010 WL 5343286, at *18 (Tenn. Crim. App. Dec. 22, 2010). The enhanced penalty is triggered for a person charged with selling a controlled substance if the jury determines beyond a reasonable doubt that any part of the sale occurred in a drug-free zone. *See State v. Timothy Allen Johnson*, No. M2015-01160-CCA-R3-CD, 2016 WL 3435589, at *4 (Tenn. Crim. App. June 15, 2016) (evidence was sufficient to support a conviction for sale within a school zone when the location where money was exchanged was within the school zone even though drugs were exchanged after the defendant and the undercover officer left that location). A conviction for conspiracy to commit a qualifying offense within a drug-free zone only requires that an overt act by one of the conspirators took place within the zone. *Arturo Jaimes-Garcia*, 2010 WL 5343286, at *13 (the enhanced penalty was triggered when defendant's overt act in furtherance of the conspiracy took him within 1000 feet of a school and rejecting defendant's contention that a conviction for conspiracy to sell cocaine in a drug-free school zone required proof of an agreement to sell within the school zone); *see also State v. Alfred Maron Williams, et al.*, No. E2018-00670-CCA-R3-CD, 2020 WL 2120088, at *18 (Tenn. Crim. App. May 4, 2020).

- 11 -

In this case, Defendant does not contest that the evidence was sufficient to establish that he conspired to possess heroin with the intent to sell or deliver; conspired to sell heroin; possessed heroin with the intent to sell or deliver; manufactured heroin; or possessed drug paraphernalia, and we find that the evidence was sufficient to support the offenses. As stated above, Defendant's sole challenge to the sufficiency of the evidence is that the State failed to prove that "the controlled drug buys occurred within 1,000 feet of the real property that comprises a school and park[.]" Viewing the evidence in a light most favorable to the State, the evidence demonstrated that the qualifying offenses occurred within a drug-free zone. The proof showed that Counts 1 and 5 occurred within 1,000 feet of Fulton High School; Counts 2, 6, 15, and 16 occurred within 1,000 feet of Halston River Park and Halston River Greenway; and the offenses in Counts 3 and 7 occurred within 1,000 feet of Cumberland Estates Park and Cumberland Estates Recreational Center. Both Investigator Jinks and KGIS employee Chris Halcomb testified concerning the proximity of the buys to the drug-free zones.

Defendant's argument as to this issue centers around the testimony of Mr. Halcomb, a database and landbase administrator for the KGIS, who testified that his partner created three standard aerial maps, from the KGIS database using a computer program, to show the proximity of the controlled buys in this case to parks, including greenways, a recreational center, and a school. Mr. Halcomb testified that the maps were accurate to within one horizonal foot. Defendant argues that Mr. Halcomb was not qualified to testify concerning the maps because he was "not an engineer or technician that actually created these maps utilized as evidence to convict [Defendant]." Defendant further asserts that no expert was called to testify and that the KGIS maps were unreliable. However, Defendant cites no legal authority as to why Mr. Halcomb's position as the KGIS's database and landbase administrator disqualifies him from testifying about the maps created by his agency. In fact, Mr. Halcomb testified that part of his duties at KGIS included using a computer program to create maps of different areas in Knox County. He further testified as to how the maps are created. The "jury was allowed to use common sense in evaluating the information and witness's testimony" in determining whether the controlled buys were within 1,000 feet of a drug-free zone. *See State v. Steven O. Hughes-Mabry*, No. E2011-02255-CCA-R3-CD, 2013 WL 4046466, at *11 (Tenn. Crim. App. May 16, 2013) (internal citations omitted). We conclude that the evidence was sufficient to establish that the qualifying offenses occurred within 1,000 feet of a school, park, and recreational center. Defendant is not entitled to relief on this issue.

## II. Denial of Motion for a Continuance

Defendant contends that the trial court erred by denying his motion for a continuance due to multiple violations of Tennessee Rule of Criminal Procedure 16 by the

State. The State asserts that Defendant has failed to meet his burden of showing that he was prejudiced by the trial court's denial of the motion.

Tennessee Rule of Criminal Procedure 16 (a)(1)(F) lists the evidence that is subject to disclosure by the State, which includes documents and objects. The rule states:

> Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings, or places, or copies or portions thereof, if the item is within the state's possession, custody, or control and:
> (i) the item is material to preparing the defense;
> (ii) the government intends to use the item in its case-in-chief at trial; or
> (iii) the item was obtained from or belongs to the defendant.

Rule 16(d)(2) provides that if there has been noncompliance, the trial court may order the offending party to permit the discovery or inspection, **grant a continuance**, prohibit the introduction of the evidence not disclosed or enter such other order as the court deems just under the circumstances. Tenn. R. Crim. P. 16(d)(2) (emphasis added). "[T]here is no mandatory exclusion that follows a violation." *State v. Sherri Mathis*, No. M2009-00123-CCA-R3-CD, 2012 WL 4461767, at *37 (Tenn. Crim. App. Sept. 26, 2012). The trial court "has wide discretion in fashioning a remedy for non-compliance with a discovery order, and the sanction should fit the circumstances of the case." *State v. Downey*, 259 SW.3d 723, 737 (Tenn. 2008). "[W]hether the defendant has been prejudiced by the failure to disclose is always a significant factor" in determining the appropriate remedy." *State v. Smith*, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995).

The granting of a continuance rests within the sound discretion of the trial court. *State v. Odom*, 137 S.W.3d 572, 589 (Tenn. 2004). We will reverse the denial of a continuance only if the trial court abused its discretion and the defendant was prejudiced by the denial. *State v. Hines*, 919 S.W.2d 573, 579 (Tenn. 1995). In order to show prejudice, the defendant must demonstrate that a different result might reasonably have been reached if the trial court had granted the continuance or that the denial of the continuance denied the defendant a fair trial. *Id*.

In this case, Defendant filed a motion to continue which included a list of "documents and pieces of recent discovery" that he claimed were untimely provided by the State. At trial, defense counsel informed the trial court that he had requested "all the data on all of [the] phones, and . . . got reports and only the Cellebrite data on one phone." The State then told the trial court that all of the data was provided to Defendant in discovery. In his brief, Defendant asserts that "considering the late turnover of discovery, the [t]rial

[c]ourt erred in requiring [Defendant] to proceed to trial with new counsel who, had no opportunity to prepare his defense in violation of his constitutional rights." Defendant further asserts that if defense counsel had been given the opportunity to "review, analyze, inspect, or otherwise be given sufficient notice of the evidence against [Defendant]," he would have had the opportunity to obtain an expert "to analyze the data on the phones, had time to interview all the newly added witnesses, prepare a proper cross-examination of the State's witnesses, and bring sufficient evidence to counter any State allegation."

On appeal, as pointed out by the State, Defendant does not allege what specific "items" should have been turned over to him earlier or how the outcome of his trial would have been affected had a particular piece of evidence been given to him earlier or had the trial been continued. Defendant merely asserts in his brief that he was prejudiced and that he "had no opportunity to challenge the admission of the late turn [sic] over evidence. Absent the entry of the late turnover of each specific item, there is a strong likelihood that [Defendant] would have been acquitted." As to Defendant's claim that he did not receive full data from the cell phones recovered in this case, this issue is waived because Defendant did not include the raw data in the appellate record. *See State v. Demetrious Tommy Lee*, No. M2020-00914-CCA-R3-CD, 2021 WL 3825219, at *8 (Tenn. Crim. App. Aug. 27, 2021) (defendant waived his Rule 16 claim by failing to include the substance of the late discovery in the appellate record), *no perm app. filed*.

In this case Defendant has not met his burden of demonstrating that he was prejudiced by the trial court's denial of his motion for a continuance. He is not entitled to relief on this issue.

### III.    Cross-examination of Mr. Berry

On appeal, Defendant argues that the trial court erred by not allowing him to cross-examine Mr. Berry about his dismissed charges of aggravated robbery, kidnapping, thefts, and aggravated assaults against Mr. Berry's family members. In his brief, Defendant refers to the evidence as Mr. Berry's "404 and 608 background." The State asserts that Defendant has waived this issue and that the trial court properly ruled that Defendant could not cross-examine Mr. Berry about the charges.

As pointed out by the State, Defendant has waived any claim concerning Tennessee Rule of Evidence 404(b) because he failed to invoke the rule at trial. Defendant requested to cross-examine Mr. Berry at trial about his dismissed charges under Tennessee Rule of Evidence 608(b), and the trial court conducted a jury-out hearing under that rule. It was not until his motion for new trial that Defendant asserted that the trial court erred by denying cross-examination of Mr. Berry about his "404 and 608 background[]." It is well-settled, however, that "a party is bound by the ground asserted when making an objection" and "cannot assert a new or different theory to support the objection in the motion for a

new trial or in the appellate court." *State v. Adkisson*, 899 S.W.2d 626, 634-35 (Tenn. Crim. App. 1994). "When, as here, a party abandons the ground asserted when the objection was made and asserts completely different grounds in the motion for a new trial and in this [c]ourt, the party waives the issue." *Id.* at 635. Defendant has waived our consideration of this claim.

Defendant has also waived his claim that he should have been allowed to cross-examine Mr. Berry under Tennessee Rule of Evidence 608 because he has not developed an argument on this claim with analysis or any legal authority. Tennessee Rule of Appellate Procedure 27(a)(7) requires that briefs contain arguments with regard to each issue presented that include "citations to the authorities ... relied on." *See also* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument [or] citation to authorities ... will be treated as waived" on appeal). "It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Board of Prof'l Responsibility,* 301 S.W.3d 603, 615 (Tenn. 2010); *State v. Cross*, 362 S.W.3d 512, 526 (Tenn. 2012).

As pointed out by the State, Defendant is not entitled to plain error review of the trial court's limitation of his cross-examination of Mr. Berry because he has not requested such review. *See State v. Kevin Waggoner*, No. E2018-01065-CCA-R3-CD, 2019 WL 4635589, at *21 (Tenn. Crim. App. Sept. 24, 2019) (declining plain error review where defendant did not assert that the alleged error amounted to plain error); *State v. Ray Armstrong*, No. W2016-01996-CCA-R3-CD, 2017 WL 6375950, at *16 (Tenn. Crim. App. Dec. 12, 2017) (declining plain error review where defendant did not request or make any argument regarding plain error). Defendant is not entitled to relief on this issue.

## IV.    Drug-Free School Zone Act

Defendant contends that sentencing enhancement under the Drug-Free School Zone Act in effect at the time of the offenses, which requires 100% mandatory minimum service, "as applied to the unique circumstances of his case" violates the proscriptions against cruel and unusual punishment contained in the Eighth Amendment to the United States Constitution and Article I, Section 16 of the Tennessee Constitution because it renders his sentences "grossly disproportionate" to his offenses. The State responds that Defendant has waived this issue, and even if not waived, this court "has previously and consistently rejected similar proportionality challenges to the Act.[2]

---

[2] The Tennessee General Assembly subsequently amended the Drug-Free School Zone Act to afford trial courts discretion in applying the sentence classification enhancement and reduced the distance for the enhancement from 1,000 feet to 500 feet of a drug-free zone's real property. T.C.A. § 39-17-417(b)(1)(2020). Under the amended Act, a defendant sentenced for violation of

- 15 -

The Tennessee Rules of Criminal Procedure mandate that certain issues be raised before trial, including "[d]efenses and objections based on defects in the indictment, presentment or information (other than that it fails to show jurisdiction in the court or to charge an offense which objections shall be noticed by the court at any time during the pendency of the proceedings)." Tenn. R. Crim. P. 12(b)(2). This Court has previously applied the Rule 12 waiver rule to constitutional challenges to the Drug-Free School Zone Act. *See State v. Roberto Vasques,* No. M2004-00166-CCA-R3-CD, 2005 WL 2477530, at *21-22 (Tenn. Crim. App. Oct. 7, 2005). However, in *State v. Smith,* 48 S.W.3d 159, 162 n. 1 (Tenn.Crim.App.2000) this court noted the Rule 12 waiver for failure to file a pre-trial motion but heard the issue on the merits because the State failed to raise waiver at the motion for new trial hearing or on appeal. In this case, it is not known whether the State raised the issue of waiver at the motion for new trial hearing because the record on appeal does not contain the transcript of the motion for new trial hearing. It is Defendant's burden to prepare an adequate record for appellate review. Tenn. R. App. P. 24(b).

In any event, the State has raised the waiver issue on appeal, and we find that this issue is waived because Defendant failed to file a pretrial motion challenging the constitutionality of the Drug-Free School Zone Act. He cannot cure the failure to file a pretrial motion by raising this issue in his motion for new trial. *State v. Rhoden*, 739 S.W.2d 6, 10 (Tenn. Crim. App. 1987); *State v. Diallo Jamel Lauderdale*, No. W2001-01296-CCA-R3-CD, 2003 WL 22080777, at *12 (Tenn. Crim. App. Sept. 5, 2003) (defendant waived his constitutionality claim by failing to attack the constitutionality of the statute until his motion for new trial).

Waiver notwithstanding, we decline any plain error review on this issue because Defendant has not requested such relief. *Kevin Waggoner*, 2019 WL 4635589, at *21; *Ray Armstrong*, 2017 WL 6375950, at *16. We note that the issue raised by the Defendant on appeal has previously been addressed by this Court. We have held that the sentencing provisions of the Drug-Free School Zone Act in effect at the time of the offenses in this case do not violate the constitutional protections against cruel and unusual punishment. *State v. Jenkins,* 15 S.W.3d 914, 919 (Tenn.Crim.App.1999); *Smith,* 48 S.W.3d at 173; *State v. Jordan Thomas Peters*, No. E2014-02322-CCA-R3-CD, 2015 WL 6768615, at *11 (Tenn. Crim. App. Nov. 5, 2015); *State v. Steve Duclair*, No. E2012-02580-CCA-R3-CD, 2014 WL 1663152, at *11 (Tenn. Crim. App. Apr. 23, 2014); and *State v. Antonio Rico Walls,* No. M1998–00358–CCA–R3–CD, 2002 WL 1343234, at *3 (Tenn. Crim. App. June 20, 2002).

## V.    **Withdrawal of Joint Plea Offer by the State**

Defendant argues that the trial court erred by denying his motion for new trial based

---

subsection (b) is no longer required to serve at least the minimum sentence. *Id*. § 39-17-432(c)(1) (2020).

- 16 -

on prosecutorial vindictiveness. He asserts that the prosecutor violated his due process rights by offering him and Co-defendant Washington a fifteen-year plea at thirty percent conditioned upon both men accepting the offer which was withdrawn after Co-defendant Washington decided not to plead guilty. Defendant further notes that Co-defendant Washington "was found not guilty of said offenses." The State responds that the joint plea offer was properly withdrawn when Co-defendant Washington decided not to accept the plea.

Initially, as pointed out by the State, Defendant in his brief references a plea offer of fifteen years at thirty percent that was made prior to jury selection. However, the record does not contain a transcript of the jury selection or any other discussion concerning this offer. Therefore, his claim as to the pretrial offer is waived. *See* Tenn. R. App. P. 24(b)(it is defendant's burden to prepare a complete transcript). There was a discussion about another plea offer that occurred at the onset of the third day of trial. Defense counsel informed the trial court that Defendant had been offered "a total effective of 15 at 100 on one Count, 8 at 30 on another. He also noted that Defendant had accepted the offer and was "willing to plea[.]" The discussion of this offer, which was also rejected by Co-defendant Washington, was included in the record on appeal. "[T]here is no constitutional right to plea bargain." *Weatherford v. Bursey*, 429 U.S. 545, 561 (1977). The decision to extend, or, conversely, withdraw a plea offer at any time prior to its acceptance by the trial court lies solely within the discretion of the prosecutor, and "[t]here is simply no authority for the proposition that a plea agreement can be enforced prior to acceptance by the court." *State v. Turner*, 713 S.W.2d 327, 329 (Tenn. Crim. App. 1986) (citing *Metheny v. State*, 589 S.W.2d 943, 945 (Tenn. Crim. App. 1979) ); *see also Parham v. State*, 885 S.W.2d 375, 382 (Tenn. Crim. App. 1994) (stating that "the district attorney general may withdraw or revoke the plea agreement" until it is accepted by the trial court).

"When there are multiple defendants, the district attorney general may make an offer of settlement contingent upon all of the defendants accepting the offer and pleading guilty." *Parham* 885 S.W.2d at 382. This court has consistently approved of "all or nothing" or "package" deals like the one offered in this case. *See, e.g.*, *State v. Street*, 768 S.W.2d 703 (Tenn. Crim. App. 1988); *Hodges v. State*, 491 S.W.2d 624 (Tenn. Crim. App. 1972); *see also, e.g.*, *State v. Joseph Lance Risner*, No. E2002-01112-CCA-R3-PC, 2003 WL 21492929 (Tenn. Crim. App. June 30, 2003); *Edward Dean Mullins v. State*, No. E2002-00730-CCA-R3-PC, 2003 WL 402814 (Tenn. Crim. App. Feb. 24, 2003); *Crystal Rena Sturgill v. State*, No. E2002-00385-CCA-R3-PC, 2003 WL 239743 (Tenn. Crim. App. Feb. 4, 2003); *Natasha W. Cornett v. State*, No. E2002-00034-CCA-R3-PC, 2002 WL 31174214 (Tenn. Crim. App. Sept. 30, 2002). Nothing about the facts of this case distinguish it from any others in which similar plea offers have been made. *See Hodges*, 491 S.W.2d at 628.

In this case, the prosecutor extended a plea offer to Defendant and Co-defendant Washington expressly conditioned upon both men accepting the offer. Although

Defendant accepted the offer, Mr. Washington declined to plead guilty, and the offer was withdrawn by the prosecutor. The prosecutor acted properly and did not engage in prosecutorial vindictiveness in making the joint plea offer to Defendant and Co-defendant Washington and then withdrawing the offer when Co-defendant Washington declined to plead guilty. Prosecutorial vindictiveness occurs when a prosecutor punishes or retaliates against a defendant for exercising his legal or constitutional rights. *See North Carolina v. Pierce*, 395 U.S. 711, 724-25 (1969); *State v. Gossett*, No. W2015-02414-CCA-R3-CD, 2017 WL 1163683, at *16-17 (Tenn. Crim. App. Mar. 28, 2017). Defendant had no constitutional right to a guilty plea, and he did not exercise a legal or constitutional right by accepting the plea offer. Accordingly, Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review of the record, we affirm the judgments of the trial court.

_____
JILL BARTEE AYERS, JUDGE